# Richmond

## LUCERNE CREAM AND BUTTER COMPANY V. MILK COMMISSION OF VIRGINIA.

March 13, 1944.

Record No. 2731.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*M. A. Hutchinson, Spotswood Keene* and *Hanson, Lovett & Dale,* for the appellant.

*Abram P. Staples, Attorney General,* and *Edwin H. Gibson, Assistant Attorney General,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This appeal presents the specific question whether or not the Milk Commission has exceeded the power conferred upon it by chapter 357, Acts of 1934, page 558, as amended, Virginia Code, 1942 (Michie) sections 1211w to 1211mm, to fix the price of milk. The constitutionality of the Act creating the Commission and conferring upon it certain powers and duties is not involved. That was settled in *Reynolds* v. *Milk Comm.,* 163 Va. 957, 179 S. E. 507.

The Lucerne Cream and Butter Company is a corporation duly organized to engage in the milk business in Virginia. It sells and distributes its milk in the Arlington-Alexandria area, in approved sanitary waterproof cardboard containers, exclusively through stores.

Prior to and after the appellant entered into business in Virginia, the Milk Commission conducted several public hear-

ings and investigations for the purpose of fixing the price or prices for milk in the Arlington-Alexandria market. As a result of its investigation, it concluded that there was considerable loss to distributors of milk in glass, by reason of breakage, non-return of bottles, etc. To offset the loss to distributors in bottles, it adopted a rule requiring that a deposit of three cents per bottle be collected over and above the purchase price of the grade of milk sold in bottles, the deposit to be returned upon return of the bottle.

It found as a fact that the cost of delivery in glass under the bottle deposit requirement was less than the cost of delivery in paper containers. It then fixed the price of the several grades delivered in glass and added to that price one cent per quart for the same grades delivered in other than glass containers. The effect of this was to reduce the formerly established price of milk one cent per quart when sold in bottles without any reduction being allowed when it was sold in other than glass containers.

The Milk Commission accordingly adopted regulation number four for the Arlington-Alexandria Milk Market, which, so far as is material here, reads as follows:

"RETAIL AND WHOLESALE SELLING PRICES

"The following schedule of minimum prices shall prevail in the Arlington-Alexandria Sales Area, exclusive of the salvage or redemption value of any container in which any milk, and/or cream, or other product listed herein is delivered to a purchaser:

|  | Retail | Wholesale |
|---|---|---|
| "A. * * * | | |
| "B. Milk 3.25 - 4.1% butterfat (sold through stores—cash and carry) | | |
| Quarts (delivered in glass containers) | $.13 | $.11 |
| Quarts (delivered in other than glass containers) | .14 | .12 |

"C. * * *

"D. Milk 4.11 - 5.25% butterfat (including Jersey and Guernsey Milk sold through stores—cash and carry)

Quarts (delivered in glass containers) ....................$ .15    $ .13
Quarts (delivered in other than glass containers).............. .16     .14"

The appellant petitioned the Milk Commission to amend or set aside the requirement that milk sold in cardboard containers should be sold at a price of one cent more per quart than when sold in glass or bottle containers, on the ground that it was without authority to fix a price differential for milk based, not on the grade sold, but on the type of container in which it was sold. It further contended that the regulation created a discriminatory classification in violation of the State and Federal Constitutions.

The Milk Commission refused to change its rule and regulation, and its holding was appealed to the Circuit Court of the city of Richmond. From an order upholding the validity of the regulation this appeal was taken. Relying for relief upon the grounds stated above, the appellant says in its brief, "All it asks is that it be permitted to sell its milk of the same grade and quality at the price fixed for its competitors."

There is no inherent power in the Milk Commission to fix the price of milk. Whatever price-making power it has must be found in the statute.

The first seven subsections (a), (b), (c), (d), (e), (f), and (g) of section 1211y, Code of Virginia, 1942, (Michie), (section 3 of chapter 357 of the Acts of Assembly, 1934), relate to the general powers and duties of the Commission. In this discussion it is unnecessary that we refer to any of them except (b) and (c). Subsections (b) and (c) are plain and clear in language and meaning, and involve no

contradiction or conflict whatever with any other section or subsection.

Subsection (b) provides that the Milk Commission shall have the power "to investigate all matters pertaining to the production, processing, storage, transportation, distribution, and sale of milk in the Commonwealth of Virginia." It confers no power upon the Commission to fix prices, but does give it power to make the investigation required by subsection (j).

Subsection (c) gives the Commission power "to supervise, regulate, and control the production, transportation, processing, storage, distribution, delivery, and sale of milk for consumption within the Commonwealth of Virginia." There is nothing said about the power to fix the price at which milk may be sold.

Subsection (h) provides that "The operation and effect of any provision conferring a general power upon the Commission shall not be impaired or qualified by the granting to the Commission by this Act of a specific power or powers." It does not add any authority to the above mentioned general powers, nor deal with the power to fix prices.

The only portion of the statute specifically relating to the price-fixing power is subsection (j), which, defining and limiting the power, provides as follows:

"(j) The commission, after public hearing and investigation, may fix the prices to be paid producers and/or associations of producers by distributors in any market or markets, *may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market, and may also fix different prices for different grades of milk. In determining the reasonableness of* prices to be paid or charged in any market or markets for any grade, quantity, or class of milk, the commission shall be *guided* by the *cost of production* and *distribution*, including compliance with all sanitary regulations in force in such market or markets, necessary operation, processing, storage and delivery charges, the prices of other foods, and the welfare of the general public." (Italics supplied.)

If the legislature had not intended that subsection (j) should provide the sole provision for fixing prices, it would have provided that power in subsection (c) and not added subsection (j) to the preceding sections.

Supervision, regulation, and control of the delivery and sale of milk does not necessarily include authority to fix the price. Subsection (j) is not in conflict with subsections (b), (c) and (h). It does not impair or qualify the general powers of the Commission, or interfere with investigation, supervision, regulation and control. It provides the policies, standards and methods which must guide the Commission in the exercise of its general powers in carrying out the declared policy of the statute.

It is a well established principle of statutory construction that when a specific power is granted by a statute and the limits of such power are therein marked out, the section granting the power and not general provisions in other sections of the statute must be looked to in ascertaining the effect and extent thereof.

The authority to fix prices, like the power to assess taxes, is the power to destroy. It is an extraordinary power and not lightly granted, and when granted is subject to the limitations of the grant.

The language of the statute is clear. The meaning of the words used is well settled. No interpretation is necessary or allowable. The Commission has the power and authority to *fix different prices for different grades of milk*. It has not been given the power to fix a different price for the same grade of milk. In fixing the different prices for different grades, it is mandatory that it take into consideration all of the factors and elements involved in its production, processing, storage, and distribution. Necessarily included in these factors is the cost of some form of container.

The Commission cannot set a price for milk which will yield exactly the same profit to each producer and distributor. It must be conceded that there is a variance in the cost of the several factors involved in the production and distribution of milk. Feed and labor may cost one producer or

distributor less than another. Mechanical processes of one may involve less expense than another. The expenses of transportation may be greater or less, according to the delivery vehicle used and the length of the haul. One distributor may employ more effective methods in the care and salvage of the container. Another may use a different and less costly or attractive container. One producer may, by inventive genius or economic measures, cut down his expenses; while another may be unwilling to avail himself of the benefits and economies practiced by a competitor.

A container is as essential as transportation and its cost may be as variant; but its cost factor must be, considered just as the cost of transportation and the other elements mentioned in the statute must be considered. Having taken into consideration all of the factors, once a price of milk is fixed for a grade it must be the same for all milk of that grade, and that is not varied by the fact that it may be delivered in glass jars, tin cans, or paper cups, or by automobile or horse and wagon. Otherwise, the degree of stabilization purposed by the statute would be decreased as the number of prices based on factors of production and distribution is increased and varied. A price determined on any one cost factor, or the elimination, in part or whole, of any one or more factors, will result in as many different prices as there are distributors.

All that the Commission can hope to do, after giving consideration to all the factors of cost of production and distribution, is to stabilize the market by fixing a price which will encourage the producer and distributor of milk to continue in business upon a profitable basis, and to provide an ample supply of an essential commodity to the general public at a fair and reasonable charge.

It is not conducive to stabilization to set a different price for the same grade of milk based on separate factors. It is to cope with the variation in the cost of the essential factors, and to avoid different prices in the same localities, that the legislature authorized milk areas to be formed within the State so as to localize the elements entering into costs.

The Act was not intended to discourage the installation of new machinery, the employment of new processes, or the practice of economical operation. Rather it was intended to encourage them, both as a benefit to the producer and the consumer, and thereby favor the public weal.

If a producer and distributor, using fiber or paper containers, is satisfied to sell his milk at the same price as a competitor who uses glass containers, the consumer who prefers the fiber or paper type of container has no complaint. So long as the producer and distributor who uses bottles as containers makes a fair profit, he has no just grievance. There is nothing unfair, unjust, or demoralizing in either trade practice.

If a milk producer or distributor cannot use cardboard containers and make a sufficient profit to remain in business, when selling at the minimum price, he will, in all probability, discontinue marketing his product in such a container and return to delivery in bottles.

It cannot be for the welfare of the general public and for the best interest of the consumer that the consumer shall be required to pay one cent per quart more for the same grade of milk, when all that he is interested in is the milk and not the container in which it is delivered. The article sold is the milk, not the container. The difference is merely in the packaging and the packaging is a matter of choice to the consumer rather than a matter of value.

The Act creating the Commission and defining and providing for its functions, duties and powers must be viewed and considered in its entirety. Its language was evidently chosen with great care. It provides that the Commission *may* perform certain functions and duties; but in the performance thereof it *must* observe certain rules and standards of guidance. The Commission "may fix the minimum and maximum wholesale and retail prices for milk to be charged in any market, and may also fix different prices for different grades of milk;" but in the exercise of those important functions, it "shall be guided by," that is, must be guided by,

and take into consideration all of the elements of cost enumerated in subsection (j).

The Milk Commission, however, undertakes to relieve itself of the duty of giving effect to the policies and standards by which it must be guided by contending that subsection (h) of section 1211y removes all restrictions upon the general powers conferred upon it and leaves it with practically unlimited power to fix prices. Then, despite the fact that it does not go so far as to claim that the statute gives it power to fix a different price for the same grade of milk, it relies upon an artifice, the omission of a factor of distribution, or the partial consideration of that factor (a factor required by the statute to be fully considered before any price is established) to allow it to effect a differential in price by basing a classification of milk upon the type of container in which it is sold.

The regulation and control of milk production and distribution, through delegated authority of the legislature, is comparatively new, and consequently there are few cases arising as to the price-fixing power of the delegated agency. We have been cited to no case which supports the contentions of the appellee.

In *Supplee-Wills-Jones Milk Co.* v. *Duryee,* 116 N. J. L. 75, 181 A. 908, (1935), the Supreme Court of New Jersey, in construing a statute conferring upon a milk control board the power "to supervise and regulate the entire milk industry of the State of New Jersey, including the production, importation, transportation, manufacture, storage, distribution, delivery, and sale of milk and milk products," held that, "Supervision and regulation of the delivery and sale of an article do not necessarily include authority to fix the price."

In *Challenge Cream, etc., Ass'n* v. *Parker* (Cal. App.), 125 P. (2d) 864, affirmed by the Supreme Court of California on October 29, 1943, 142 P. (2d) 737, a case involving the exercise of the price-making power under a milk control law where the maximum and minimum prices for different grades of milk were to be set after consideration of the costs of production and distribution, including the costs

of processing, selling and delivery, it was held that there was no authority conferred whereby a differential of one-half a cent could be charged for milk sold and delivered in fiber containers rather than in containers for which a deposit was required. The classification was deemed to be arbitrary and capricious, not based on any difference in the grade of the product sold.

The paper containers having no inherent value, the obvious effect of the regulation here complained of was to fix a different price for the same grade of milk. Thus, the consumer who preferred the paper container, or was unable to purchase milk except in that type of container, was required to pay one cent more per quart than one who obtained it in bottles, provided the latter returned the bottles. The consumer who, through choice or necessity, purchased in bottles had to pay two cents more per quart than the one who purchased in other than glass, if the glass container was broken or not returned. Naturally, consumers purchase milk of the same grade and quality at the least possible cost. Consequently, a distributor using other than glass containers is handicapped in competition in a market where glass containers are used and are obtainable, if he is required to charge one cent more per quart for his milk.

To eliminate, in part or whole, an essential factor in the cost of distribution in the determination of the reasonableness of the price to be charged for a specific grade of milk in a designated area, and thereafter use that factor as a basis for a differential in price for the same grade of milk is violative of the letter and the spirit of the statute in form and in substance. It is productive of discrimination against producers and distributors using different containers, unjust and costly to consumers who may be unable to purchase, for any reason, the lower priced milk of the grade desired, and contrary to the statutory plan of stabilization.

In the absence of any express legislative declaration to the contrary effect, the Milk Commission of Virginia, if it undertakes to fix the price or prices of milk, must fix the same price for the same grade, after giving full considera-

tion to all of the cost factors of production and distribution enumerated in the statute. It cannot validly set up a classification based upon one of such factors for the purpose of establishing a differential in price for the same grade.

For the foregoing reasons, we are of opinion that the regulation under review is invalid insofar as it undertakes to establish a difference in price for the same grade of milk, based upon the type of the container in which it is sold. The conclusion which we have reached makes it unnecessary to consider the constitutional questions which were raised.

The order of the trial court is, therefore, reversed and a final order in accordance with our conclusion will be here entered.

*Reversed and final order.*

BROWNING, J., dissenting.

I am not in accord with the majority opinion and in stating the reasons for my dissidence I shall go somewhat into the facts that led up to the situation with which the Milk Commission was confronted.

The Virginia Act creating a Milk Commission first found in Chapter 357, Acts 1934, page 558, and passed by the General Assembly as an emergency measure on March 29, 1934, since amended but not in any particular of importance to this inquiry, is the subject of this litigation.

The precise act or ruling of the Commission which is challenged is rule or regulation number 4 governing the sale of milk in the Arlington-Alexandria Milk Market, which fixed the sale price of milk sold in paper or fiber containers at 1¢ more per quart than the same grade or character of milk sold in glass or bottle containers.

The general subject of milk control, including production, distribution and sale to dealers and to consumers has long been a disturbing and perplexing one in this and many other States. Some idea of its extent here may be had by quoting the preamble to the Act, which is as follows:

"Whereas, the production and distribution of milk and cream is an industry upon which to a substantial degree, the prosperity and health of the people of the Commonwealth of Virginia depend; and the present economic emergency is in part the result of the disparity between the prices of milk and cream and other commodities, which disparity has diminished the power of milk producers to purchase industrial products, has broken down the orderly production and marketing of milk and cream, and has seriously impaired the agricultural assets supporting the credit structure of · the commonwealth and local political sub-divisions thereof; and

· "Whereas, unhealthful, unfair, unjust, destructive and demoralizing economic trade practices have grown up, and. are now carried on in the production, sale and distribution of milk, and milk and cream products in the Commonwealth, which impair the dairy. industry in the Commonwealth, and the constant supply of pure wholesome milk to the inhabitants thereof, and constitute a menace to the health, and welfare of the inhabitants of the Commonwealth; and

"Whereas, in order to protect the well-being of the people of the Commonwealth of Virginia, and to promote the public welfare, public health and public peace, the production, transportation, processing, storage, distribution, and sale of milk and cream in the Commonwealth of Virginia, is hereby declared a business affecting the public peace, health and welfare, which should be supervised and controlled in the exercise of the police power of the Commonwealth in the manner hereinafter provided; now, therefore, etc."

In carrying out the provisions of the Act and the accomplishment of its purposes the Commission adopted the policy of establishing geographical areas in the State, which are called markets, and looking to the welfare of all of the interests concerned it convened persons, natural and artificial, whose well being might be affected, in meetings to settle and determine issues or questions related to the industry. Parties contestant with their witnesses and attorneys were heard.

The area with which the Commission had to do in this case ·is composed of· the city of Alexandria and counties in the northern part of ·the State, adjacent to the Potomac river and opposite the District of Columbia and the city of Washington, called the Arlington-Alexandria Milk Market. There were in this market some twelve distributors and producer-distributors when Lucerne, the appellant, applied· for a license. Prior to that time it had owned and operated a sanitary milk plant in the city of Washington. The commission issued to Lucerne on August 28, 1940, a distributors license and one month later it petitioned for a modification of the price fixing regulations.

As appears, Lucerne's grievance grew out of the fact that the Commission had established a differential of 1¢ in favor of those distributors who used bottles as containers for delivery as against deliveries in containers other than glass bottles. The appellant-filed its petition with the Commission for relief based upon the alleged lack of legal authority to establish this differential.

After quite a lengthy hearing the Commission declined to abrogate the rule complained of or modify it and the case was appealed to the circuit court of the city of Richmond, in accordance with statutory requirement, which court entered an order on December 8, 1942, holding that the Commission had the authority to adopt paragraphs "B" and "D" of Regulation No. 4 of the rules and regulations governing the Arlington-Alexandria Milk Market and that they were neither arbitrary nor unreasonable nor in conflict with constitutional or statutory law and dismissing the petition. From this order Lucerne appealed; hence the case is before us.

The portions of the Act which are particularly germane to the questions at issue consist of the opening paragraph of Section 1211y and the sub-paragraphs (b), (c), (h) and (j). They are as follows:

"The commission is hereby declared to be an instrumentality of the Commonwealth, vested with power:

"(b) To investigate all matters pertaining to the production, processing, storage, transportation, distribution and sale of milk in the Commonwealth of Virginia.

"(c) To supervise, regulate, and control the production, transportation, processing, storage, distribution, delivery and sale of milk for consumption within the Commonwealth of Virginia.

"(h) The operation and effect of any provision of sections 1211w to 1211mm conferring a general power upon the commission shall not be impaired or qualified by the granting to the commission by this act of a specific power or powers.

"(j) The commission, after public hearing and investigation, may fix the prices to be paid producers and/or associations or producers by distributors in any market or markets, may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market, and may also fix different prices for different grades of milk. In determining the reasonableness of prices to be paid or charged in any market or markets for any grade, quantity, or class of milk, the commission shall be guided by the cost of production and distribution, including compliance with all sanitary regulations in force in such market or markets, necessary operation, processing, storage, and delivery charges, the prices of other foods, and the welfare of the general public."

Paragraphs "B" and "D" of Regulation No. 4 fix the prices, retail and wholesale, of milk in quarts delivered in glass containers and delivered in other than glass containers. They reveal the 1¢ differential which we have referred to. It seems needless to list the prices in detail.

The appellant brought error in three particulars. The first calls in question the authority of the Commission to adopt the regulation complained of. The second assails the regulation as in violation of the Constitution of Virginia and the Fourteenth Amendment to the Federal Constitution. The third attacks the regulation as being arbitrary, unreasonable and capricious.

The first assignment will receive major consideration for I regard it as the most important and the burden of the appellant's effort, I think, revolves about it.

It is urged that in no provision of the law can there be found the power given to the commission to fix different prices except for different grades of milk, in other words the price cannot be variant conditioned upon the character of container used in delivery.

The contention is that in paragraph (j) alone is perceived the Commission's authority to fix different prices of milk and the reasoning is very nearly limited to these lines of the paragraph: " * * * may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market, and may also fix different prices for different grades of milk." The important significance of the last sentence or clause in the paragraph is left out of view, which is to the effect that the reasonableness of prices fixed in any market for any grade, quantity, or class of milk, shall be determined by the Commission according to the cost of production and distribution, including compliance with all sanitary regulations in force in such market, operation, processing, storage, and delivery charges, the prices of other foods and the welfare of the general public.

It will be noted that the words embraced in the act, upon which the appellant well nigh rests its case, are permissive, that is, the Commission *may*, (if it elects or thinks wise and best,) exercise certain rights, or it *may* not, but its guide in determining the matter of prices is imperative. It *shall*, in the exercise of this most important function, be guided by and take into consideration all the elements enumerated above, the last, and I shall say the greatest, being designated, "the welfare of the general public."

I am impressed with the thought that the Milk Commission, in the administration of the important trust with which it is charged, has been given by the legislature almost plenary power, and the underlying reason for such grant of authority is the well being of the general public. It would be impossible to conceive a more wholesome and benign purpose.

In its investigations the Commission found that, in round numbers, the sum of $29,000.00 per annum was saved to the milk consuming public by the 1¢ reduction. Lucerne complains of its plight as compared with that of the bottle distributors in that economic field. But to me it is highly conceivable that it might readily adopt a bottle delivery and at the same time retain its fiber container and supply the demands of two types of consumer, one the general public and the other a discriminating public who might prefer the single delivery container, which is said to be perfectly sanitary, and who would be willing to pay the extra cost for this assurance.

It is also proper to state that the commission had before it witnesses, lay and expert, representing every conceivable interest to be affected and it had the benefit of a comprehensive report on costs of distributing milk in the Boston market prepared for the Massachusetts Milk Control Board by Charles F. Rittenhouse & Co., certified public accountants, Boston and New York, and a report by the Bureau of Markets to the Director of Agriculture pertaining to the costs for distributing fluid milk for the Los Angeles County marketing area, and a treatise entitled The Single Service Container and its Effect on Milk Distribution Costs, by the fluid market assistant for the California State Department of Agriculture. This constituted a reservoir of information for its guidance.

It will be further noted that in paragraph (b) the Commission is vested with the power to investigate all matters incident to supplying milk for the consumer, and that in paragraph (c) it is given the power to control and regulate the various steps between production and delivery and sale of milk.

The intention of the legislature, which is always a cardinal point to be considered in the construction of a statute, undoubtedly was, as expressed in the preamble to the Act, to promote the public welfare, public health and public peace of the Commonwealth of Virginia, and the production

and sale of milk and cream was declared to be a business affecting all of those values.

The final pronouncement of the preamble is that the supervision and control of the business should obtain in the exercise of the police power of the Commonwealth "in the manner hereinafter provided."

Of course, the preamble is not a part of a statutory enactment but it may always be recited as indicating the intention of the law makers and as affording the reasons for the enactment.

The position of the appellant that the recitals of the preamble cannot be so employed unless there be ambiguity as to the meaning of the act is not sound, I think, and if it were, I would say that it is difficult indeed to so frame human language in the making of a law as not to render it susceptible to some doubt, especially if it serves the purpose of the interpreter to so view it.

My motion that the Act viewed and considered in its entirety, as it must be, affords ample warrant for the decision of the trial court becomes quite apparent. But if I had any doubt of it it would be dispelled by a fair consideration of paragraph (h). Why this provision has not had a larger place in the discussions found in the briefs in the majority opinion I do not know. To my mind it is exceedingly impressive as settling the questions at issue. It is in these words:

"(h) The operation and effect of any provision of sections 1211w to 1211mm conferring a general power upon the commission shall *not be impaired or qualified by the granting to the commission by this act of a specific power or powers*." (Italics mine.)

Perhaps the lawmakers foresaw just such an effort as is here made and forestalled it by making this provision a part of the act. The creator erected a fortress to protect the structure from successful assault. This is just what that provision does in my opinion.

In the case of *Reynolds* v. *Milk Comm.*, 163 Va. 957, 179 S. E. 507, this court, in an exhaustive opinion written by Mr. Justice Gregory, held the Milk Act constitutional. It

withstood the vigorous attack made upon it. But for that the right of the Commission to fix prices, in any event, would doubtless be assailed.

The constitutionality of the Act was also upheld in the case of *Highlands Farm Dairy* v. *Agnew*, 300 U. S. 608, 57 S. Ct. 549, 81 L. Ed. 835, in which the late Mr. Justice Cardozo delivered the opinion, and this was said:

"The power of a state to fix a minimum price for milk in order to save producers, and with them the consuming public, from price cutting so destructive as to endanger the supply, was affirmed by this court in *Nebbia* v. *New York*, 291 U. S. 502, 78 L. ed. 940, 54 S. Ct. 505, 89 A. L. R. 1469, and in other cases afterwards."

I have cited the above not as precisely applicable to the issues involved in this case but as showing the extent to which the Supreme Court of the United States has gone in upholding the general powers of the Commission.

Two fairly recent cases which are informative and interesting as to the questions under consideration are *Borden's Farm Products Co.* v. *Ten Eyck*, 297 U. S. 251, 56 S. Ct. 453, 80 L. Ed. 669, and *Mayflower Farms* v. *Ten Eyck*, 297 U. S. 266, 56 S. Ct. 457, 80 L. Ed. 675. They are particularly applicable to the second assignment of error which, it will be remembered, charges discrimination and a denial of equal protection of the laws and thus offends the Virginia State Constitution and the Fourteenth Amendment of the Federal Constitution.

These cases are cited by the appellant and to some extent relied upon by it and they are analyzed by the appellee showing that the facts in each of them are quite dissimilar to those in the case at bar.

The quotation from the opinion in the *Borden's Case*, *supra*, found in both briefs is not sufficiently full and complete to render comprehensive the meaning of the writer, who was Mr. Justice Roberts. This is what was said in full: "To adapt the law to the existing trade practice was neither unreasonable nor arbitrary. The present case affords an excellent example of the difficulties and complexities which

confront the legislator who essays to interfere in sweeping terms with the natural laws of trade or industry. The danger in such efforts always is that unintended dislocations will bring hardship to groups whose situation the broad rules fail to fit. Where, as here, there is recognition of an existing status and an attempt to equate the incidence of the statute in accordance with it, we find a compliance with, rather than a disregard of, the constitutional guaranty of equal protection. The appellant cannot complain if, in fact, the discrimination embodied in the law is but a perpetuation of a classification created and existing by the action of the dealers. In the light of the facts found the legislature might reasonably have thought trade conditions existed justifying the fixing of a differential. Judicial inquiry does not concern itself with the accuracy of the legislative finding, but only with the question whether it so lacks any reasonable basis as to be arbitrary. *Standard Oil Co.* v. *Marysville*, 279 U. S. 582, 586, 587, 73 L. Ed. 856, 860, 861, 49 S. Ct. 430."

This is applicable to the case at bar because there was an existing status in Virginia, as recognized in the preamble to the Act, and in the finding of fact, and an attempt is perceived to equate the incidence of the statute in accordance with it, and that was found to be a compliance with, rather than a disregard of the Constitutional guaranty of equal protection. It was held that the differential was not objectionable as destructive of equality between the two persons affected.

It is well to note that the differential between the two types of container established by the Commission by Regulation No. 4, paragraphs "B" and "D", became effective before Lucerne or any fiber distributor came into the Market. Therefore it could not have been aimed at a particular distributor using fiber containers, but its application is general.

A finding of fact by the Commission is a part of the record and it is replete with information gleaned by it in nine separate hearings, three of which were at the instance of Lucerne, the last one in February, 1941, and consuming three days. It also sets forth quite fully its reasons for the

differential. To recite all of them would lengthen this dissent to a tedious extent. It seems sufficient to say that what is known in the trade as a bottle deposit was adopted. Its mechanics are these: For milk sold in bottles through stores the consumer is required to deposit 3¢ per bottle, which is returned when the bottle is returned. Theretofore the expense of the bottles incident to their being lost or never getting back to the distributor was substantial. It is shown that without the deposit, bottles made an average of 6 trips only and then they were lost sight of. On the other hand with the deposit obtaining a bottle would make from 46 to 73 trips. It is not difficult to see that this cost had to be paid or absorbed by someone and this someone is generally, and certainly in this case, the consumer. The Commission found by this saving in the cost of bottles the price of milk to the consumer could be reduced 1¢ per quart. So that the price of the milk sold in bottles was reduced in that amount, which was passed on to the consumer, but the price fixed for the fiber container distributor remained the same, or where it was, which is a difference of 1¢ per quart. Now if the bottle deposit of 3¢ were eliminated the reduction to the consumer could not be had and the bottle distributor and fiber distributors would be left to their own devices as competitors, which the Commission reasons would put the business back in the confused state which theretofore existed.

It is also well to say that the finding of fact shows that the Commission, in fixing the prices, took into consideration all of the incidents and factors entering into the milk industry and did not base the 1¢ differential on any single item as, for instance, the container. I am impressed by the apparent thoroughness, patience and fairness of the Commission in solving the vexing problems before it and its success in adjusting a complex situation affecting such a variety of interests.

I may say that this court and like courts of other states have construed similar statutes with reference to their spirit and reason, which is obedience to a vital conception of statutory construction.

In the case of *Enoch* v. *Commonwealth*, 141 Va. 411, 435, 126 S. E. 222, the following excerpt was quoted with approval:

"In Black on Interpretation of Laws 48, many cases are cited in support of the following statement of the text: 'A statute should be construed with reference to its spirit and reason; and the courts have power to declare that a case which falls within the letter of the statute is not governed by the statute, because it is not within the spirit and reason of the law and the plain intention of the legislature.'"

And in *Stanley* v. *Tomlin*, 143 Va. 187, 129 S. E. 379, it is said:

" * * * it is essential that the statute be construed 'with reference to its subject matter, and the object sought to be obtained, as well as the legislative purpose in enacting it; and its language should receive that construction which will render it harmonious with that purpose rather than that which will defeat it.' *Mapp* v. *Holland*, 138 Va. 519, 122 S. E. 430, 37 A. L. R. 478."

I cannot escape the conviction that the majority opinion is a grave blow to the usefulness of the Milk Commission. It is a constricted interpretation of a statute that is based upon humane principles designed to promote and conserve the public well-being. It sterilizes a legislative effort which was conceived in a desire to thwart a growing economic evil. I fear that it is about to go the way that many critics of liberal government wish all bureaus and boards and commissions to go. To them it is a consummation devoutly to be wished. They are unpopular in the extreme. I think we must discriminate between those which serve a salutary purpose and those that are either useless or harmful.

If government is not to remain static but is to progress to a state of higher efficiency I know of no substitute for such member of its body, as this, which has been crippled, as I see it, by judicial fiat.