# Richmond

SAFEWAY STORES, INCORPORATED V. MILK COMMISSION OF VIRGINIA, ET AL.

June 13, 1955.

Record No. 4344.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*William H. King, Arthur B. Hanson, Garland Clarke* and *Emmett E. Tucker, Jr.,* for the appellant.

*J. Lindsay Almond, Jr., Attorney General; Thomas M. Miller, Assistant Attorney General; Harry L. Ryan, Jr., John J. Carmody, F. Gloyd Awalt, W. V. T. Justis, William Blum, Jr.* and *Bolling R. Powell, Jr.,* for the appellees.

SPRATLEY, J., delivered the opinion of the court.

The facts in this case are without dispute, and the sole question presented is whether the Milk Commission of Virginia is empowered to establish prices other than minimum and maximum wholesale and retail prices for the same grade of milk within a given marketing area.

On July 17, 1953, the Milk Commission of Virginia, hereinafter referred to as the Commission, held a public hearing for the purpose of considering evidence relating to an adjustment of resale prices of fluid milk in the Arlington-Alexandria Milk Market. Several distributors of milk in that area had requested an advance in prices because higher wages, material and equipment had increased the cost involved in distribution. Safeway Stores, Incorporated, licensed and authorized to sell milk and milk products in the same area, also appeared and participated in the hearing. Safeway Stores buys milk from producers for resale to its customers exclusively through its various stores in the Arlington-Alexandria area. It said that, notwithstanding the increased cost of labor, material and equipment, it could make a reasonable profit without an increase in the price of milk delivered through its stores. It opposed any increase, but recommended that the Commission raise the existing differential

between store-delivered and home-delivered milk from 2 to 2½¢ per quart.

On July 28, 1953, after a consideration of the evidence, the Commission found that the cost to distribute milk had increased at least one-half cent per quart. It accordingly issued Order No. 4, raising the resale price on both the wholesale and the retail level one-half cent per quart, with proportionate adjustments for lesser quantities, effective July 29, 1953.

On August 28, 1953, Safeway Stores filed with the Commission a petition for a reconsideration of the above Order, praying that minimum and maximum prices be fixed for the various grades of milk in conformity with the provisions of the Act establishing the Commission. The petition specifically pointed out that the Commission had fixed four different prices for the grade classified as "Milk, Cultured Wholemilk, Homogenized Milk, 3.25-4.25% Butterfat, Chocolate or other Flavored Milks or Drinks (To contain not less than 1% butterfat), and Cultured Buttermilk containing more than 1.5% butterfat," in that it had set a price of 24½¢ for a single quart delivery, 23½¢ for a three-quart delivery, 22¢ for a six-quart delivery, and 22½¢ for a single quart delivered through stores. It also called attention to the fact that the same pattern had been followed for other grades of milk.

Pending a consideration of the above petition by the Commission, Safeway Stores filed a petition in the Circuit Court of the City of Richmond for an appeal from Order No. 4 of the Commission. It again challenged the variance and difference in prices fixed for the same grade of milk. It alleged that the Commission had acted in an arbitrary, unreasonable and capricious manner, and prayed that it be required to "establish a reasonable minimum price and a reasonable maximum price for each grade of milk with reasonable spreads as between the minimum prices and the maximum prices for all grades."

Before the appeal could be heard by the Circuit Court, the Milk Commission issued Order No. 5, amending and correcting certain items in its order No. 4, wherein quantity discounts and related prices were lower than sales from stores.

As amended, the pertinent parts of Order No. 5, the order here challenged, read as follows:

## "RETAIL AND WHOLESALE SELLING PRICES

"The following schedule of minimum prices shall prevail in the Sales Area, exclusive of the salvage or redemption value of any container in which any milk, and/or cream, or other product listed herein is delivered to a purchaser.

"A. *Milk, Cultured Wholemilk, Homogenized Milk, 3.25-4.25% Butterfat, Chocolate or other Flavored Milks or Drinks (To contain not less than 1% Butterfat), and Cultured Buttermilk containing more than 1.5% Butterfat*

|  | Retail | Wholesale |
|---|---|---|
| Gallons—Bulk .......................... |  | .85 |
| Half-gallons (sold through stores) ..... | .45 |  |
| Quarts—one to five quarts per delivery.. | .24½ | .22 |
| *Quarts—Six or more quarts per delivery (not less than) ................... | .22½ |  |
| Quarts (sold through stores) ......... | .22½ |  |
| Pints ............................. | .14 | .12½ |
| Half-pints ......................... | .08 | .07 |

"B. *Milk 4.26-5.5% Butterfat—Including Jersey and Guernsey Milk*

|  | Retail | Wholesale |
|---|---|---|
| Gallons—Bulk ...................... |  | .93 |
| Half-gallons (sold through stores) ..... | .49 |  |
| Quarts—one to five quarts per delivery.. | .26½ | .24 |
| *Quarts—Six or more quarts per delivery (not less than) ..................... | .24½ |  |
| Quarts (sold through stores) ......... | .24½ |  |
| Pints ............................. | .15 | .13½ |
| Half-pints ......................... | .08¼ | .07¾ |

* "I. The quantity prices prescribed in Paragraphs A, B, C, D and E of this Regulation for the home-delivery of six quarts or more shall not apply except where purchases are equivalent to six quarts or more per home-delivery for a regular billing period of not less than one calendar month.

"J. The schedules of prices of milk (sold through stores) shall apply only to sales of milk made to and by stores, having a merchant's license, which sells milk, in the original containers, to be consumed either on or off the premises, and to licensed distributors of milk making retail sales in the sales room of their distributing plants."

"C. *Vitamin "D" Homogenized Milk*
    *3.25-4.25% Butterfat*

| | | |
|---|---|---|
| Gallons—Bulk ..................... | | .85 |
| Half-gallons (sold through stores) ..... | .47 | |
| Quarts—one to five quarts per delivery.. | .25½ | .23 |
| *Quarts—six or more quarts per delivery (not less than) .................... | .23½ | |
| Quarts (sold through stores) ......... | .23½ | |
| Pints ............................. | | .13 |
| Half-pints ........................ | | .07 |

        *   *   *

"See paragraph 1."

The same differentials in prices were made in five other classes of milk.

The Commission thus having failed to establish minimum and maximum prices for the same grade of milk, and having established various minimum prices based on method of delivery, the cause came on to be heard in the Circuit Court of the City of Richmond, with respect to the validity of the schedule of prices in Order No. 5. That court sustained the order of the Commission, and we allowed this appeal.

I

█ The Act creating the Milk Commission and defining and prescribing its functions, duties and powers was manifestly drafted with much care. Acts of Assembly, 1934, Chapter 357, pages 558, *et seq.* The objects, purposes and limitations of the Act are clearly expressed in language that needs no interpretation. It means just what it says. The only portion which relates to the price-fixing power of the Commission is subsection (j), formerly § 1211y, Code of Virginia, (Michie) 1942, now § 3-359,* Code 1950. Having no

---

* "§ 3-359. *Fixing prices.* The Commission, after public hearing and investigation, may fix the prices to be paid producers or associations of producers by distributors in any market or markets, may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market, and may also fix different prices for different grades of milk. In determining the reasonableness of prices to be paid or charged in any market or markets for any grade, quantity, or class of milk, the Commission shall be guided by the cost of production and distribution, including compliance with all sanitary regulations in force in such market or markets, necessary operation, processing, storage and delivery charges, the prices of other foods, and the welfare of the general public."

inherent power to fix the price of milk, the authority of the Commission to exercise such power must be found only in the provisions of that section. *Lucerne, etc. Co.* v. *Milk Commission,* 182 Va. 490, 496, 29 S. E. (2d) 397.

Section 3-359 contains three provisions.

The first authorizes the Commission to "fix the minimum and maximum wholesale and retail prices to be charged for milk in any market." There is no authority for the fixing of a minimum price alone. The only power granted is to fix "minimum and maximum prices."

The use of the word "and" connecting the words "minimum" and "maximum", in the statutory clause, points to the conclusion that it was the intention of the legislature that "and" should have its ordinary, literal conjunctive meaning. Cf. *South East Public Service Corp.* v. *Commonwealth, etc.,* 165 Va. 116, 122, 181 S. E. 448. The grant of power to fix minimum and maximum prices is specific and affirmative, and in the absence of any express legislative declaration to the contrary effect, must be held not to include authority for the fixing of a price in the singular. This is further manifest when the first provision is read in connection with the third, because it provides the means whereby each may be made fully effective.

The second provision expressly authorizes the Commission to "also fix different prices for different grades of milk." This is a specific power granted by statute and limited by the power marked out. It negates any authority to fix different prices for the same grade of milk.

Had the legislature intended to grant the power to fix different prices for the same grade of milk, it would have caused the provision to read: "also fix different prices for the same or different grades of milk."

The third provision enumerates the factors which shall guide the Commission "In determining the reasonableness of prices to be paid or charged in any market or markets for any grade, quantity, or class of milk." Named are the factors of "cost of production and distribution, including compliance with all sanitary regulations, * * *, necessary operation, processing, storage and delivery charges, the prices of other foods, and the welfare of the general public." This provision is a consequence of the first, which in providing for minimum and maximum prices recognizes that there are various fac-

tors which are peculiar to some producers and distributors and absent from others. Under it, minimum prices may be fixed on the basis of representative reasonable total cost of the essential factors, and maximum prices allowed because of single items of cost peculiar to some distributors. Thus, if minimum and maximum prices are fixed, the spread between them will allow the distributor who renders a service different from that of another to make a charge commensurate with the service rendered. The consumer may choose whether he desires the extra service.

The words "grade, quantity, or class" in the first portion of the third provision refer to and qualify the word "milk." They permit classification of milk according to "grade, quantity, or class." They do not permit classification according to the method of distribution; *i.e.*, whether by home-delivery or store-delivery. The quality of the milk of a particular grade or class is not affected merely by reason of the method of delivery, the character of its container, or the quantity involved.

Section 3-359 was intended, in accordance with the object and purposes of the entire Act, to benefit both the distributor and the consumer. It was obviously recognized that some distributors, by resourcefulness and enterprise may operate in a more economical manner than others; that some consumers, because of convenience or necessity, desire milk to be delivered to their homes; while others, for reasons of thrift or convenience, may prefer to purchase from stores. The cost of home-delivery may be as varied as the cost of the different kinds of containers, the character of the delivery vehicle, the means and method of delivery or the distance of its transportation. The quantum of delivery, whether in large or small amounts, the size of the vehicle used and the efficiency of the human element each may vary carrying costs. The grade of the milk, however, is no more affected by the means and manner of delivery than it is by the character of the container. It is the same grade in either case, whether sold in stores or delivered to homes.

## II

The determination of this case is controlled by what we said in *Lucerne, etc. Co.* v. *Milk Commission, supra*. In that case the differential in the price of milk was based on the cost of the character of container used. Here the differential is based on the means or method of delivery. There, we held that the Commission had not

been given authority to fix different prices for the same grade of milk; and that once it fixed a price for a grade, "after giving full consideration to all of the cost factors of production and distribution enumerated in the statute," it must be the same price for all milk of that grade. The Commission cannot validly set up a classification based upon one of the factors enumerated in the statute for the purpose of establishing a differential in price for the same grade of milk. 182 Va. page 501.

When the cost of delivery has been considered with all other items of cost in the fixing of a minimum price, and thereafter the cost of home-delivery is singled out as the basis for an upcharge, the result will be that a single item of cost is given double consideration. A price determined on any one cost factor, in part or whole, or elimination of any one or more factors will result in many different prices. If, however, minimum prices are fixed on the basis of representative reasonable cost of the essential factors, and maximum prices are allowed based on single items of cost peculiar to some distributors, the provision of the statute will be observed, and both the distributor and the consumer will be protected. A field is provided wherein free enterprise and economical operation may have fair play, and the benefits provided for all interested parties will serve the welfare of the general public.

■ We are of opinion, however, that the provision directing the Commission in the determination of "the reasonableness of prices to be paid for * * * any grade, quantity or class of milk," to be guided "by the cost of production and distribution, * * *," read in connection with its authority to "fix minimum and maximum wholesale and retail prices" is sufficient to empower it to fix a discount in price for quantity sales. A discount based on quantity is not a price differential based on grade such as is prohibited. The price is the same for the same grade in any quantity involved. A differential measured by quantity results in no discrimination between distributors or between consumers. It applies to all alike, and allows an economic saving both to seller and purchaser.

### III

In the *Lucerne case, supra,* there was no question raised as to the provision that the Commission "may fix the minimum and maximum wholesale and retail prices * * * to be charged," nor was there any

contention that a price differential based on quantity could not be fixed.

■ The Commission does not, in its brief in this case, challenge the requirement that it fix both minimum and maximum milk prices, if it fixes them at all. It undertakes to relieve itself of compliance on the ground that it has been its general practice over a period of years to fix differentials between store and home-delivery prices, and that its practice has been acquiesced in by Safeway Stores. This cannot be allowed to overrule and invalidate the plain requirements of the statute. A commission created by the legislature to administer a statute is wholly limited in its power and authority by the law of its creation. Its authority must affirmatively appear from the statute under which it claims to act. It is not vested with discretion to ignore or transgress statutory limitations, even to accomplish what it may deem to be desirable ends, nor does the acquiescence in, or the failure to object, on the part of others lend validity to any such departure.

## IV

The Commission relies upon the decision in *American Can Co. of Mass.* v. *Milk Control Board*, 316 Mass. 337, 55 N. E. (2d) 453. While the purpose and intent of statutes of other States regulating the milk industry are the same, the variance in their language and requirements render the decisions from other jurisdictions of little value to us in the consideration of the precise question here before us.

Section 11(b) of the Milk Control Act of Massachusetts provides that a minimum price order may classify milk "by such forms, classes, grades or uses as the board may deem advisable and may specify the minimum prices therefor." 55 N. E. (2d) at 454. In the employment of this broad language, it is significant that the right to classify is not limited to classes or grades of milk, but allows classification of such milk by such forms or uses "as the board may deem advisable and may specify the minimum prices therefor." Under those provisions and considering the Act as a whole, the court held that in fixing *minimum prices* there could be taken into account not only the kind or quality of the product sold but the entire service rendered by the seller in making the sale, so that a higher price could be fixed for milk that is delivered to the residence of the buyer than for the same kind and

quality of milk not so delivered. No such provision as § 11(b) appears in the Virginia statute. Moreover, our statute in providing for the fixing of minimum and maximum prices takes cognizance of the difference in the cost of factors involved in delivery.

In California, Pennsylvania, New Jersey and Oregon, the courts have expressed views in harmony with our decision in *Lucerne, etc. Co.* v. *Milk Commission, supra.* Cf. *Challenge Cream & Butter Ass'n.* v. *Parker,* 23 Cal. (2d) 137, 142 P. (2d) 737, 149 A. L. R. 1203; *Milk Control Commission of Pennsylvania* v. *United Retail Grocers Ass'n.,* 361 Pa. 221, 64 A. (2d) 818; *Supplee-Wills-Jones Milk Co.* v. *Duryee,* 116 N. J. L. 75, 181 A. 908; *Sunshine Dairy* v. *Peterson, et al.,* 183 Ore. 305, 193 P. (2d) 543.

In Oregon the right to classify milk according to the method of delivery is expressly granted. It is provided by statute, O. C. L. A. § 34-1012, that wholesale and retail prices to be charged for milk sold in that State shall be fixed according to certain named classes, including sales "by producer-distributor and distributor for deliveries to homes of consumers; provided, that based on differences in cost of said various services, if any, the board, upon facts found by it, may establish differentials in prices between house-to-house sales by dealers, house-to-house deliveries by stores, and sales on credit and over-the-counter sales by stores for cash." *Sunshine Dairy* v. *Peterson, et al., supra,* 193 P. (2d) 543, 548.

## V

■ We find no merit in the contention that Safeway Stores is not a "person aggrieved" by the order of the Commission, and for that reason this Court lacks jurisdiction over the subject matter of the appeal. In the first place, it is conceded that Safeway Stores is a distributor of milk as defined by the statute, and must comply with the order of the Commission, and failure to obey such orders would subject it to criminal prosecution. In the second place, Safeway Stores' contention that the order of the Commission is null and void on the ground that the Commission did not comply with the statute in fixing a maximum as well as a minimum price for the same grade of milk entitled it to engage in this litigation because its interest in the controversy was and is immediate and pecuniary. It is not difficult to realize the difference in selling appeal when the same minimum price is fixed for home-delivery of milk as that allowed for store-delivery.

Where minimum and maximum prices are fixed, the spread between them will allow prices for both store and home delivered milk to find their natural levels. The distributor may, within the prescribed limits, charge the price which will yield him a fair return for his method of service, and, if there be a difference between the prices charged for store and home delivery, the consumer can elect the type of service which he deems most to his advantage. Thus, distributors and consumers may each take advantage of the economic factors which affect them respectively.

The order of the trial court is, therefore, reversed and a decree will be entered here directing the Milk Commission of Virginia to correct and amend its order No. 5 by fixing the minimum and maximum wholesale and retail prices to be charged for milk in the Arlington-Alexandria Milk Market, in accordance with the views herein expressed.

*Reversed and final decree.*