## Richmond

MILK COMMISSION OF VIRGINIA AND ALEXANDRIA DAIRY PRODUCTS
COMPANY, INCORPORATED v. SAFEWAY STORES, INCORPORATED.

March 10, 1958.

Record No. 4726.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Whittle, JJ.

The opinion states the case.

*T. Justin Moore, Jr., Special Assistant Attorney General and*

*Bolling R. Powell (Kenneth C. Patty, Attorney General; Thomas M. Miller, Assistant Attorney General,* on brief), for the appellants.

*Arthur B. Hanson (William H. King; Emmett E. Tucker, Jr.,* on brief), for the appellee.

HUDGINS, C. J., delivered the opinion of the court.

■ This case is a sequel to *Safeway Stores, Inc.* v. *Milk Commission,* 197 Va. 69, 87 S. E. 2d 769, wherein we sustained the contention of Safeway Stores, Inc., that the Milk Commission was required by Code, § 3-359 to establish both a "reasonable minimum price and reasonable maximum price for each grade of milk with reasonable spreads as between the minimum prices and the maximum prices for all grades" sold in the Arlington-Alexandria market. We reversed the decree of the lower court affirming an order of the Commission that fixed only the minimum resale prices of milk, and remanded the case to the Commission with directions to correct and amend its order "by fixing the minimum and maximum wholesale and retail prices to be charged in the Arlington-Alexandria Milk Market * * *."

In complying with the foregoing mandate and under the authority granted it by Code, § 3-355,[1] the Commission gave notice that on July 14, 1955, it would hold a public hearing for the purpose of determining, "whether or not it would be to the public interest for the Milk Commission to withdraw the exercise of its powers in the Arlington-Alexandria Milk Market and/or the Manassas Milk Market and for the further purpose of considering the entire price structure concerning the sale of milk and to consider an adjustment in any or all prices of the sale of milk for the said Arlington-Alexandria Market and/or the Manassas Market." Although the Commission held a joint hearing for both the Arlington-Alexandria and Manassas milk markets, no question is presented herein as to the validity of any order entered by the Commission involving the Manassas market.

At the hearing, which lasted two full days, the Commission heard, or read, the unsworn statements of 37 witnesses, including the attorneys for the respective parties, numerous and voluminous exhibits

---

[1] Code, § 3-355 provides that: "The Commission may withdraw the exercise of its powers from any market after a public hearing has been held for such market, and the Commission determines that it will be to the public interest to withdraw the exercise of its powers from such market."

consisting of newspaper and magazine articles and editorials.[2] On August 25, 1955, the Commission in its order designated "Arlington-Alexandria Market Order No. 11," held that it was to the public interest for it to continue to exercise its authority in the Arlington-Alexandria milk market by fixing the prices to be paid producers by distributors. And by a vote of two to one it held that it was to the public interest for it to fix the minimum and maximum wholesale and retail prices to be charged for milk in that market.

From this order Safeway Stores, Inc., appealed to the circuit court of the city of Richmond. That court, without hearing additional exidence, reviewed the case on a transcript of the evidence considered by the Commission, and upheld the Commission's finding that it was to the public interest for it to continue to exercise its authority in the Arlington-Alexandria market by fixing the prices to be paid for milk by the distributors to the producers. However, the court reversed the Commission's finding that it was to the public interest for it to fix the minimum and maximum wholesale and retail prices to be charged for milk in that market. In so holding, the court in its decree said that "there has been shown no reasonable basis in fact to justify the conclusion of the Defendant [Commission] that it would not be in the public interest to withdraw its regulatory authority in fixing resale prices of milk in the Arlington-Alexandria Market, and * * * the Defendant has abused its discretion in so failing to withdraw from resale price fixing of milk in such Market, thereby acting in an unreasonable and capricious manner." From that decree the Commission and the Alexandria Dairy Products Company, Inc., an intervenor in the lower court, obtained this appeal.

The only substantive question presented is whether the lower court erred in the exercise of its statutory power of judicial review under Code, § 3-371(4), in declaring void that part of the order of the Commission fixing the minimum and maximum wholesale and retail prices of milk in the Arlington-Alexandria milk market.

Code, § 3-371(4) permits an interested party to appeal from an order of the Commission to the circuit court of the city of Richmond,

---

[2] Informal hearings before the Commission are authorized by Code, § 3-371(3) which provides in part as follows: "Mere technical irregularities in the procedure of the Commission shall not be the basis of the decision of the court. In an appeal from an order or decision of the Commission, the case shall be heard upon the record certified to the court by the Commission. * * * No part of the record, containing verbal or documentary evidence, shall be disregarded by courts because of technical rules of evidence."

defines the issues to be determined by the court and limits its authority in this language:

"* * * Upon the hearing, *the court shall determine whether the order appealed is within the discretion vested in the Commission by law*, and if so, *whether the Commission has exercised a reasonable discretion or the order is unreasonable and capricious*. If the Commission is found to be without authority of law to enter the order complained of, or that it was unreasonable and capricious, the court shall enter an order declaring the order of the Commission null and void. *Where the appeal is from a finding of fact, the order of the Commission shall be given the weight of a jury on a fact found*. If the court finds that the findings of fact are not sustained by the evidence, the court may either declare such findings of fact void or remand the case to the Commission for further proceedings." (Italics supplied).

It will be observed that this statute provides that the court shall determine two things: (1) "whether the order appealed is within the discretion vested in the Commission by law," and (2) "whether the Commission has exercised a reasonable discretion or the order is unreasonable and capricious." No issue is presented on this appeal as to the validity of the lower court's affirmative determination of the first requirement of the statute.

Code, §§ 3-354, 3-355 and 3-359 empower the Commission, after a public hearing and investigation, to determine whether it is "to the public interest" to fix the prices to be charged for milk on both the producer and resale levels of marketing. The Commission and the intervenor contend that when these Code provisions are considered in connection with the second requirement of Code, § 3-371(4), the evidence does not warrant the lower court's holding that the Commission's order, finding that it was to the public interest to continue its price fixing powers on the resale level, was unreasonable and capricious.

The provisions of the Milk and Cream Act (Acts 1934, c. 357, p. 558) were adopted by the General Assembly for the purpose of protecting and benefiting the consumers, the producers and the distributors of milk in the Commonwealth; hence it is "to the public interest" (Code, §§ 3-354, 3-355) to maintain for all the inhabitants of Virginia a constant supply of pure wholesome milk at reasonable prices. *Safeway Stores, Inc.* v. *Milk Commission, supra; Pet Dairy Products Co.* v. *State Milk Commission*, 195 Va. 396, 78 S. E. 2d

645; *Lucerne Cream and Butter Co.* v. *Milk Commission*, 182 Va. 490, 29 S. E. 2d 397.

In our determination of the question presented, we must keep in mind the requirement of Code, § 3-371(4), that the court give the order of the Commission "the weight of a jury verdict on a fact found." This means that the evidence, and all reasonable inferences to be drawn therefrom, must be resolved in favor of the facts found by the Commission, and that an order based thereon must be sustained if there is credible evidence to support it. And to be incredible, the evidence "must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the explanation and meaning of which reasonable men should not differ." *Daniels* v. *Transfer Co.*, 196 Va. 537, 544, 84 S. E. 2d 528.

In defining the weight that the courts must give to a jury's verdict, we have said: "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Burrell* v. *Burrell*, 193 Va. 594, 603, 70 S. E. 2d 316. "It is not sufficient that the judge, if on the jury, would have rendered a different verdict. It is not sufficient that there is a great preponderance of the evidence against it. If there is conflict of the testimony on a material point, or if reasonably fair-minded men may differ as to the conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, in all such cases the verdict of the jury is final and conclusive and cannot be disturbed either by the trial court, or by this court, or if improperly set aside by the trial court, it will be re-instated by this court." *Hoover* v. *Neff & Son*, 183 Va. 56, 62, 31 S. E. 2d 265; *Burke* v. *Scott*, 192 Va. 16, 63 S. E. 2d 740; *Bradley* v. *Commonwealth*, 196 Va. 1126, 86 S. E. 2d 828.

[■ Safeway Stores, Inc., relies upon *Rountree* v. *State Milk Commission*, 184 Va. 777, 36 S. E. 2d 613, to support its contention that this rule does not apply to our review of the evidence in this case. The facts in that case are quite different from the facts in this case and hence that decision is not pertinent to the issues here raised. That case involved a direct appeal to this Court under the express provisions of Code, § 3-369, from the decision of the Commission denying an application for a producer-distributor license. Suffice it to say that the provision of Code, § 3-371(4), requiring the circuit court of the city of Richmond to give a finding of fact

by the Commission the weight of a jury's verdict, is not incorporated in Code, § 3-369.

The great majority of the witnesses were consumers who, for various reasons and with varying degrees of emphasis, stated in effect that the resale prices of milk in the Arlington-Alexandria market were too high, and that it would be to the public interest for the Commission to withdraw the exercise of its resale price fixing powers in that market. The witnesses expressing this view included mothers of large families, several members of the General Assembly, a witness speaking on behalf of the Arlington County Board of Supervisors, representatives of Safeway Stores, Inc., and High's Dairy Products Corporation (two of the nine distributors of milk in the Arlington-Alexandria market), and several other individuals speaking in their own behalf or as representatives of social or civic organizations.

The opinions and reasons urged by the witnesses in support of the view that the Commission should withdraw its resale price fixing powers may be summarized thus: (1) any regulations of prices violates the principle of free enterprise, (2) withdrawal of resale price controls would increase the consumption of milk and thus better the health of the people, (3) the economic emergency which was responsible for the creation of the Commission is past and (4) producers would not suffer financial loss because increased milk consumption would benefit them.

The Commission disagreed with this line of evidence, opinions and argument and held that it was not to the public interest for it to withdraw its resale price fixing powers in this market. Therefore, our inquiry, as was that of the trial court, is limited and restricted by Code, § 3-371 (4) to a determination of whether there was credible evidence to support the finding of the Commission.

The evidence tending to support the order of the Commission may be summarized as follows: The Arlington-Alexandria milk market, under the jurisdiction of the Virginia Milk Commission, comprises approximately one fourth of the total milk market known as the Washington Metropolitan area. Arthur B. Hanson, representing Safeway Stores, Inc., said that for "all marketing purposes the Washington Metropolitan area is recognized as a single economic unit." The prices of milk in the three fourths of this market outside the jurisdiction of the Commission are unregulated and uncontrolled both on the producer and resale levels.

There is evidence in the record tending to show that if the resale

prices of milk are not fixed by the Commission in the Arlington-Alexandria market, where it is conceded to be to the public interest to regulate the prices paid to producers, the Virginia producers will be placed in the position of being required to sell their milk in Virginia at a fixed price which very probably would be higher than the price at which the Virginia distributors could sell to consumers. This would depend on the price the distributors would have to pay the producers in the large unregulated market adjoining the Arlington-Alexandria market.[3]

Honorable James M. Thomson, a candidate for the House of Delegates at the time of the hearing and who was subsequently elected to that body, said: "I have sat through these hearings for a day and a half now and have been very enlightened by the evidence put on by the dairymen, the distributors, and the consumers, and that brings me to one conclusion, and it is that you have a very complex decision to make, and that is, if it is in your hands, I hope you will keep prices on in this area. * * * I don't ask you to take the control off of it, but ask you to retain it." This witness also stated that the existing conditions of the milk industry in the unregulated part of the Washington Metropolitan market had "developed into a price war already."

John R. Hubbard, business representative and secretary-treasurer of a union of dairy employees "in the greater Washington area" (500 of whom lived in Virginia), stated that the Commission should not be "persuaded" to withdraw its resale price fixing powers in the Arlington-Alexandria market. In regard to the adjoining unregulated market, he said: "I have seen in the past three or four years, due to the extreme discounts the dairies are giving and what is taking place when merchants are demanding excessive discounts—I have seen dairies change hands. I have seen people have to sell a dairy out because they were not making enough money to get by on. At the present time in the Washington area, I know that there are dairies that are just hanging on by borrowing more money in order to stay in business."

---

[3] It is interesting to note that the Virginia Advisory Legislative Council, in its report to the Governor and General Assembly, bearing date of November 14, 1957, stated that: "* * * We are convinced that, once the power to control retail prices is abolished, there would be an eventual collapse of adequate prices to the Virginia producer. * * * Retaining the power of the Milk Commission to control only prices paid to Virginia producers would be a roundabout way to destroy the Milk Commission. This would be a death blow to one of the most important industries in this State." (House Document No. 15, at page 12.)

Six witnesses appeared on behalf of the farmer-producers supplying milk to the distributors in the Arlington-Alexandria market, all of whom urged the Commission to continue to regulate the producer price of milk. Two of these witnesses expressed no view concerning the necessity for also maintaining resale price controls. But the four others stated that the Commission should continue resale price controls in this market. One of these producers, James E. Click, who appeared on behalf of 200 producers, said the conditions of the milk market at that time were approaching the conditions which existed when the Milk and Cream Act was enacted in 1934; that the farmer was faced with declining farm income and purchasing power, and concluded by requesting the Commission "to continue the exercise of its powers" in the Arlington-Alexandria market.

Only four of the nine distributors in this market presented statements at the hearing, none of whom asked the Commission to withdraw its price fixing powers at the producer level. As stated, Safeway Stores, Inc., and High's Dairy Products Corporation urged the Commission to withdraw its resale price fixing powers from that market. The witnesses speaking on behalf of the Alexandria Dairy Products Company, Inc., the largest distributor in this market, urged the Commission to continue regulating the resale prices of milk. Bolling Powell, who represented this dairy, said:

"It seems to me just as clear as black and white, or night and day, that the Commission cannot set a minimum price to be paid to the farmers by the producers *in this area* and state that that will be carried out and paid, if at the same time they do not set a minimum price that must be paid to the distributors *in this area*. If the distributors are not protected by the minimum price, they can't pay the farmer the minimum price. We have got to have them both. * * * The fact that milk may be selling for a penny or so cheaper in Washington or elsewhere is certainly no justifiable ground for this Commission's abandoning the orderly discharge of its regulatory powers and obligations." (Italics supplied).

The fourth distributor represented at the hearing, Thompson's Dairy, stated its position through R. H. Rawlins as follows: "If the Commission can treat the three segments of the market—the producer, the distributor, and the consumer—fairly and, at the same time, bring prices more nearly in line with those in the larger metropolitan plant, it should stay here and exercise its powers, if it is possible to treat them fairly. If not, I believe it should withdraw from the market." It is of especial note that this witness also said:

"At least one factor which brought about this present hearing is the fact that we have in Metropolitan Washington a market which is partially controlled (the Arlington-Alexandria Area) and the remainder free of any control. This is further complicated by the fact that the uncontrolled portion is approximately 75 percent of the total market and within the past sixty days or so a small scale 'milk war' has come into being in this larger section. New sized containers have been introduced and prices on minimum-standard butterfat milk have been lowered and relowered."

"Larger newspaper ads and other advertising media have been used to bombard the Virginia consumer and tell him that he is not being treated fairly. This has been disturbing to the average consumer in the Arlington-Alexandria Area and he feels that, temporarily at least, he is being discriminated against. He cannot know the purpose behind this movement; few do. He cannot know the purpose or how temporary this pricing will be; few do. He does know however that he wants the chance to accept or reject these new containers and products at the price now in effect in the rest of the market or at a price reasonably close thereto."

The two distributors (High's Dairy and Safeway Stores) that urged the Commission to withdraw its resale price fixing powers, supply approximately 11% of the milk consumed in the Arlington-Alexandria market. High's Dairy buys its milk outside the area controlled by the Commission at a price approximately 13 or 14 cents per gallon cheaper than that authorized to be charged by Virginia producers. Safeway Stores is primarily in the grocery business and its milk business constitutes only approximately two percent of its sales volume. It obtains this milk from its affiliate, Lucerne Milk Company. In the unregulated section of the Washington Metropolitan area Safeway Stores put on the market a new brand of milk which it was selling at substantially no profit in order to compete with High's Dairy.

The evidence further shows that since its creation in 1934, the Commission has restored stability to the Virginia dairy industry; that the dairy farmers have invested $198,000,000 in dairy stock and appliances alone, and that they contribute approximately $94,-000,000 annually to the state's economy.[4]

---

[4] It is stated in the report of the Virginia Advisory Legislative Council, *supra*, (House Document No. 15, at page 9), that: "Sound dairy enterprise has been encouraged to such an extent that the State-wide dairy-farm investment amounts to approximately $626,400,000, and the annual gross dollar income to Virginia farmers

The Commission concluded from the evidence before it that if it withdrew its resale price fixing powers from the Arlington-Alexandria milk market, "the milk business would be forced into cut-throat competition which would be destructive and demoralizing to the whole industry, producers and distributors alike, and would be therefore detrimental to the public interest."

Mr. Justice Spratley, speaking for the Court in *Safeway Stores, Inc.* v. *Milk Commission, supra,* said: "If * * * minimum prices are fixed on the basis of representative reasonable cost of the essential factors, and maximum prices are allowed based on single items of cost peculiar to some distributors, the provision of the statute will be observed, and both the distributor and the consumer will be protected. A field is provided wherein free enterprise and economical operation may have fair play, and the benefits provided for all interested parties will serve the welfare of the general public." 197 Va., at page 76.

We think the evidence, considered in the light of the applicable rules of appellate review, was sufficient to support the order of the Commission.

The Commission fixed the minimum and maximum wholesale and retail prices to be charged for milk in the Arlington-Alexandria market. However, Safeway Stores, Inc., contends in this Court that the Commission erred in fixing these prices, in that it "exceeded its powers under Section 3-359 of the Code, as construed by this Court, when it included the cost of home delivery in establishing minimum retail and wholesale prices for milk." This issue was not made the subject of an assignment of error or cross error and hence it is not properly before this Court. Rule 5:1, § 4.

Alexandria Dairy Products Company, Inc., contends that the lower court erred in requiring it to post a suspension bond in the penalty of $12,000, as a condition to its joining in this appeal. Inasmuch as an order will be entered reversing the decree of the lower

---

from dairying amounts to approximately $110,000,000. This investment is in dairy cattle, land, and the expensive dairy equipment needed to produce milk under rigid health and sanitary requirements; a large part of the income is devoted to wages, purchase of feed, purchase of new dairy herd stock and maintenance of buildings and equipment.

"The Commission has given the distributors of milk in Virginia, whose capital investment is approximately $40,000,000, a dependable source of milk supply, and has prohibited 'cut-throat competition' which prohibition in the long run promotes lower prices to the consumer."

court on other grounds, it is unnecessary to pass upon this contention.

For the reasons stated the decree is reversed and the case remanded to the lower court with directions that the order of the Commission be reinstated.

*Reversed and remanded.*