## Richmond

SOUTHSIDE COOPERATIVE MILK PRODUCERS ASSOCIATION, INCORPORATED, AND WILLIE B. IRBY v. STATE MILK COMMISSION AND BIRTCHERD DAIRY, INCORPORATED.

BIRTCHERD DAIRY, INCORPORATED v. STATE MILK COMMISSION.

April 23, 1956.

Record Nos. 4512, 4513.

Present, Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*W. M. Gravatt, Jr. (Joseph Wysor Smith* and *Hazlegrove, Shack-elford & Carr* on brief), for the appellants, Southside Cooperative Milk Producers Association Incorporated, and Willie B. Irby.

*Thomas M. Miller, Assistant Attorney General, (J. Lindsay Almond, Jr., Attorney General,* on brief), for the State Milk Commission.

*T. L. Sawyer (J. S. Lawrence* and *Savage & Lawrence* on brief), for Birtcherd Dairy, Inc.

*T. L. Sawyer (J. S. Lawrence* and *Savage & Lawrence* on brief), for the appellant, Birtcherd Dairy, Inc.

*Thomas M. Miller, Assistant Attorney General, (J. Lindsay Almond, Jr., Attorney General,* on brief), for the appellee, the State Milk Commission.

SPRATLEY, J., delivered the opinion of the court.

These appeals arise from orders of the State Milk Commission determining a controversy between the appellants, Southside Cooperative Milk Producers Association, Incorporated, and Willie B. Irby on the one hand, and Birtcherd Dairy, Incorporated, on the other. Since the issues raised by each of the appellants arise out of the same proceedings, are contained in one record, and involve related questions, the appeals will be considered together.

■ The sole question for our determination is whether the language of the Act creating the State Milk Commission and conferring upon the Milk Commission the right to supervise and control the milk industry authorized it to enter the orders hereinafter referred to. That Act was first enacted in 1934, Chapter 357, Acts of 1934. With subsequent amendments it has been codified as Title 3, Chapter 17, Code of Virginia, 1950, sections 3-341 to 3-383, inclusive.

The considerations which impelled the General Assembly to adopt the Act are found in its preamble on pages 558 and 559, Acts of 1934. "There it is made plain that the legislature was concerned with 'the prosperity and health of the people of the Commonwealth of Virginia.' Clearly, this preamble, as well as the Act itself, has economic implications: i.e., the stabilization of the milk industry so as to enable the producers (dairymen) to secure a fair price for their milk. But the passage of the Act was also prompted by a desire to provide a 'constant supply of pure, wholesome milk to the inhabitants' of Virginia. Thus the dairy business was 'declared a business affecting the public peace, health and welfare,' to be regulated as provided in the Act. These recitals set the framework for the legislation." *Pet Dairy Products* v. *Milk Commission*, 195 Va. 396, 399, 400, 78 S. E. 2d 645.

See also *Reynolds* v. *Milk Commission*, 163 Va. 957, 179 S. E. 507.

■ Southside Cooperative Milk Producers Association, Incorporated, will be hereinafter sometimes referred to as Producers Association; Willie B. Irby as Irby; State Milk Commission as Commission; and Birtcherd Dairy, Incorporated, as Birtcherd.

Producers Association is a producers cooperative milk marketing association. Its members, including Irby, sometimes hereinafter referred to as Amelia Producers, live, and have their dairy farms principally, in the Counties of Amelia, Powhatan, Prince Edward, Charlotte, Mecklenburg, and Lunenburg, within the Norfolk-Portsmouth production area. Birtcherd is one of the largest milk distributors in the State. Its principal plant for processing milk is located in the City of Norfolk, Virginia, and it has a large receiving station in Amelia county.

In 1944, it was found that the local producers immediately adjacent to the Norfolk-Portsmouth sales area were unable to supply a sufficient volume of grade "A" milk to meet the demands of the Norfolk-Portsmouth market. After a survey of numerous areas in Virginia for territory in which a new milk supply could be developed without interference with the supply of other distributors in the

Norfolk-Portsmouth production area, the Counties of Amelia, Powhatan, Prince Edward, Charlotte, Mecklenburg, and Lunenburg were included in that production area, agreeably to the desires of both the producers and distributors involved. About one-half of the new producers in the counties named, who established their bases on the Norfolk-Portsmouth market, became members of the Producers Association. The volume of milk produced by the new producers increased rapidly, and the problem of transporting it in cans to the distributing plant in Norfolk became more and more difficult.

In 1944, the milk of the producers in the above counties was delivered to Birtcherd at a receiving station which it maintained at Chase City, in Mecklenburg County. This station was closed in 1947, and a new receiving station was erected by Birtcherd in Amelia at a cost, including equipment, in excess of $225,000. Birtcherd picked up the milk in cans from the farms of the producers and hauled it to its Amelia receiving station, and by agreement with the producers charged 35¢ per cwt. for the transportation. Birtcherd thence hauled the milk to Norfolk in tank trucks without making any further charge at first. Later in 1949, it imposed a charge of 30¢ per cwt. for transporting its milk from the Amelia station to its Norfolk plant and a little later increased the charge to 65¢ per cwt. The charge in each instance was deducted from the price of the milk fixed by the Commission.

When the hauling charge to Norfolk was increased to 65¢ per cwt., the producers appealed to the Commission. After a hearing before the Milk Commission, it fixed that charge at 35¢ per cwt. Subsequently, this was increased to 50¢ per cwt. As an efficient means for collecting the transportation and hauling charges, the Commission directed that the price to be paid for milk received at Birtcherd's Amelia receiving station should be 50¢ less per cwt. than the price for that delivered at Norfolk.

For example, by its Norfolk-Portsmouth Market Order No. 2, effective January 1, 1954, the Commission fixed the price of $6.32 per cwt. for Grade "A", Class I Milk received by Birtcherd at its Amelia receiving station, and at $6.82 per cwt. for the same grade and class of milk received at its Norfolk plant.

It appears that the dairy industry has developed the "cold wall" tank method of handling milk in the producer's barn and hauling it to the distributor's plant. By this method the milk is reduced in temperature and pumped into a refrigerated tank truck, resulting in ob-

taining a higher quality of milk than by the old method of placing the milk in a ten-gallon can, placing the can in a cooler, and transporting it in an unrefrigerated truck to the platform of a receiving station.

In the summer of 1954, about 15 of the Amelia producers, who had adopted the "cold wall" tank method, advised Birtcherd that they intended to deliver their milk to Norfolk. Birtcherd immediately objected and wrote a letter to the members of the Producers Association, advising them that it would refuse to accept milk delivered to Norfolk; and would accept the same only at its Amelia station.

In September, 1954, Birtcherd filed a petition with the Commission praying that all producers operating in Amelia, Mecklenburg, Lunenburg, Prince Edward, Nottoway, Powhatan, and Charlotte Counties, hereinbefore referred to as Amelia Producers, with bases on the Norfolk-Portsmouth market, and whose production had been, or might be thereafter assigned to it, be directed to make delivery to it at its Amelia station.

On November 23, 1954, the Commission denied the request of Birtcherd. In its opinion, the Commission said that the question of whether or not Birtcherd was obligated to receive the production at Norfolk or at Amelia was not before it; but "that, if such a question should arise, it would consider it to be a matter for the courts to determine and not the Commission."

On November 26, 1954, Birtcherd advised its producers in the Amelia area, by letter, of the decision of the Commission, and further said to them that: "In order that all of the producers may be advised of our position before making any expenditure or other commitment for tank hauling. we are writing to advise that the Company will not receive the Amelia milk from the producers at its Norfolk plant or handle it in any manner other than that in which it is now being handled."

On March 19. 1955, Irby and certain other members of Producers Association, who had adopted the "cold wall" tank method, undertook to make a delivery in bulk to Birtcherd in Norfolk; but Birtcherd refused acceptance. Thereupon Producers Association and Irby filed, in the Circuit Court of the City of Richmond, a suit against Birtcherd and the Commission seeking to have Birtcherd enjoined and restrained from refusing to accept delivery of their milk at Norfolk. A preliminary injunction was granted, which expired on March 25, 1955, and an extension was refused.

On March 24, 1955, the same complainants filed a petition with the Commission containing the same complaint, and a request for an order directing Birtcherd to receive their milk at its Norfolk plant.

The Commission immediately began a hearing on the petition. Considerable evidence was heard. The Commission reviewed the evidence in the proceedings held in September, 1954, and heard extended argument.

The principal questions were whether the Commission had the authority to assign certain producers to the Amelia receiving station and others to the distributing plant of Birtcherd at Norfolk, and to fix a differential in price for the same grade of milk by means of a hauling charge based on the respective places of delivery; and whether Birtcherd had the right to elect to which of its plants the production of its Amelia producers should be delivered. Matters and facts before the Commission covered all phases of the question, the advantages and disadvantages to the respective parties, and the interests of the public.

It was shown that a number of producers, whose farms bordered on the Norfolk-Portsmouth sales area, delivered their milk to Birtcherd at its Norfolk plant and received the full Norfolk price in payment. As we have stated, the Amelia Producers, who had adopted the "cold wall" tank method, started to haul their milk in tank cars to the Norfolk plant. The hauling was done by a private contract-carrier. By this method such producers avoided the charge of 35¢ per cwt. for hauling milk from their farms to the Amelia station, thus receiving a price of 85¢ more per cwt. than for milk delivered at the Amelia station and thence transferred to Norfolk. Out of this, of course, they had to pay the hauling charges to the contract-carrier at an estimated 49.9¢ per cwt. It was pointed out in the evidence and argument that the saving did not, in fact, amount to 35¢ per cwt., in view of the cost of the facilities and equipment to employ the "cold wall" tank method. Birtcherd pointed out that delivery to its Amelia station permitted it to weigh, cool, and promptly reship to Norfolk the same day; that it was thereby enabled to inspect each can of milk and, when necessary, to reject any can or cans on account of odors, taste, or other impurities, before it was co-mingled with other milk; that thereby the standards of purity and quality of the separate producers were maintained, and the co-mingled whole not subject to rejection on account of a small percentage of impure milk; that it was also better enabled to comply with sanitary require-

ments, and by reason of control of the time of delivery to its plant in Norfolk could depend upon prompt distribution to its customers; and that if it had no control over the manner of time of delivery to its processing plant in Norfolk, it would be severely handicapped in the normal operation of its plant and the distribution of its milk. Birtcherd further pointed out that unless milk was delivered to its receiving station and hauled by it to Norfolk it had no supervision over the cooling of the milk, the time of its delivery, or the conditions under which it was transported; that the method of delivery suggested by it restricts the possible amount of loss to be sustained by the producers, and objection from its customers; and that in the event of a reduced volume of milk being delivered at its Amelia receiving station, it would be impractical to operate that station, and that its closing would result in a large loss to it.

Moreover, it was shown that the Amelia station is about 150 miles from Norfolk and draws its supply of raw milk within a radius of nearly 50 miles; that a large number of the smaller producers in the area are located on secondary roads, remote from the station, and, in the absence of a hauling contract with Birtcherd, would have difficulty in delivering their milk to any station; and if the Amelia station should be closed, the small producers would be faced with the necessity of providing additional facilities on their farms for cooling of milk at a probable cost of several thousand dollars, together with additional expenses for assembling their milk at some point where the services of a tank truck would be available. It was noted that the charge of a contract hauler for transporting milk to Norfolk would not be subject to regulation by the Commission; whereas, the hauling charge allowed Birtcherd is subject to such regulation.

It was shown that Birtcherd receives from producers during certain seasons of the year large quantities of surplus milk. Its Norfolk plant is equipped to utilize the surplus for manufacturing purposes; whereas the Amelia station is not.

At the conclusion of the hearing, and in consideration of all the facts and matters pertaining to the controversy, the Commission, by a majority vote, directed that the 15 producers then delivering direct to Norfolk be assigned to the Norfolk plant of Birtcherd; and Birtcherd be required to receive their production there; and that the production of the remaining 120 producers be assigned to the Amelia receiving station of Birtcherd; and that Birtcherd be required to receive their production at Amelia. The order named each of the producers in-

volved and directed that they deliver their production to the places of delivery specified. From this order appellants appealed directly to this Court. Code, § 3-369.

On April 6, 1955, the Secretary of the Commission addressed and forwarded to counsel for Producers Association a copy of the Commission's decision of March 25, 1955, in which the following statement was made:

"I failed, at that time, to state to you that it was also the Commission's decision that should any of those producers who were assigned to deliver to the Amelia receiving station desire to deliver direct to Norfolk by tank trucks then they should make application to the Chairman of the Norfolk-Portsmouth Local Milk Board for their assignment to the Norfolk plant rather than the Amelia plant."

Pertinent to the questions before us here are the following Code sections:

Sec. 3-346: " 'Market' means any city, town or village of the state, or two or more cities or towns or villages and surrounding territory designated by the Commission as a natural marketing area."

Section 3-352. "The Commission is declared to be an instrumentality of the Commonwealth, vested with the power:

\*    \*    \*    \*    \*    \*    \*

"(c) *Supervision and control.*—To supervise, regulate, and control the production, transportation, processing, storage, distribution, delivery and sale of milk for consumption within the State."

Section 3-359. "Fixing prices.—The Commission, after public hearing and investigation, may fix the prices to be paid producers or associations of producers by distributors in any market or markets, may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market, and may also fix different prices for different grades of milk. In determining the reasonableness of prices to be paid or charged in any market or markets for any grade, quantity, or class of milk, the Commission shall be guided by the cost of production and distribution, including compliance with all sanitary regulations in force in such market or markets, necessary operation, processing, storage and delivery charges, the prices of other foods, and the welfare of the general public."

Section 3-362, "Defining areas and milksheds.—The Commission may define what shall constitute a natural market area and define and

fix the limits of the milkshed or territorial area within which milk shall be produced to supply any such market area; provided, that producers, producer-distributors, or their successors now shipping milk to any market may continue so to do until they voluntarily discontinue shipping to the designated milk market."

The Milk Commission by its regulation of June 16, 1952, defined the Norfolk-Portsmouth Milk Market and milkshed as follows:

" 'Norfolk-Portsmouth Sales Area' means the territory included within the counties of Princess Anne and Norfolk, and the cities and towns situated therein, including the cities of Norfolk, Portsmouth and South Norfolk.

" 'Norfolk-Portsmouth Production Area' means that territory in which is located those producers supplying the market who have been approved by the 'Health Authorities' having jurisdiction in the market area."

By regulation of the Milk Commission, the word "base" is defined as meaning "the established quantity of milk and/or cream set up for each producer on an equitable basis with all other producers for apportioning fluid milk and fluid cream sales among the producers."

Regulation No. 5, Section G, for the Norfolk-Portsmouth Milk Market, provides that "Producers are not required to deliver regularly to their distributors milk produced by them in excess of their established base allotments. No producer shall have a base in more than one market." * * *

Section J of Regulation 5 provides that "A producer having a base on the market, approved by the Commission, shall have the right to continue to ship all of his milk and/or cream to the distributor at whose plant such base is established. The milk delivered by such producer shall not be rejected by the distributor so long as the milk and/or cream is delivered regularly, is merchantable, and meets all requirements of the Local and State Health Laws and Regulations.

"No producer having a base, established in the market, and assigned to a distributing plant by the Commission, can transfer his base and deliveries to another distributing plant, without having first obtained the written approval of the Local Milk Board. The decision of the Local Board in all such transfers shall be subject to an appeal to the State Milk Commission."

Producers Association and Irby contend that since the Amelia receiving station is not located in any market area established by the Commission, and as none of their milk is sold to consumers at Amelia,

the assignment of their production to that station is without authority and arbitrary.

A market area is an area over which the Commission exercises its supervisory powers in controlling the sale and distribution of milk for consumption, whereas a production area or milkshed is the territory within which milk may be produced to supply a given market area. It is not necessary for a producer's dairy farm to be located in the market area which he services with his milk. The Act creating the Milk Commission does not designate the place where a producer shall deliver his milk, or provide a method of selecting such place. That is left to be determined by the Commission, governed by just and reasonable principles of equity and sound economics.

There is no relation between the location of a dairy farm and the location of a market area, other than the health and economic factors involved, and the demands for a milk supply in a designated market area. The prices which producers receive for their milk are governed by the price established for the market to which they have been assigned. In this instance, the regulations of the Commission, No. 5 (J), required the producers to deliver their production to Birtcherd, at whose plant their base had been assigned, for distribution and consumption in the Norfolk-Portsmouth market area. The Commission has not assigned the bases of the producers to Amelia or to any other non-market area; but merely designated the place for delivery of their milk.

The Act does not contain a specific provision or system to be followed by the Commission in controlling and supervising the milk industry. The present system is established by means of rules, regulations and orders promulgated by the Commission for the several milk markets, under the provisions of Code, § 3-352 (g).

The Commission, under Code, § 3-352 (c), has supervisory authority over all the facets of the industry, including transportation and delivery. Under that authority, it clearly has the right to designate the place where producers must make delivery and distributors accept such delivery. In the absence of unreasonable, arbitrary, or foolish regulations, courts may not declare its regulations and orders invalid. The authority to require delivery by producers at a designated place would be a futile power, in the absence of authority to require distributors to accept and pay for milk which has been assigned to them for delivery at a designated place.

In *Reynolds* v. *Milk Commission, supra,* we declared the Act

creating the Commission and conferring upon it certain powers constitutional, even to the extent of fixing prices, and took occasion to point out somewhat in detail the object, purposes, and administration of the Act.

It has been uniform practice in the milk industry for producers to bear the cost of transporting their milk from the farm to the distributors. This was recognized in the earlier arrangements between the producers in this case and Birtcherd, both as to transportation to the Amelia station, and reshipment thence to Norfolk. The cost of transportation between points naturally varies according to the distances involved.

In 1953, when the Commission allowed a charge of 35¢ per cwt. for transporting milk from the farms to the Amelia receiving station and 50¢ per cwt. for handling and transportation of that milk to Norfolk, it said in its opinion, in part, as follows:

"It was admitted by the producers that a reasonable handling and/or transportation charge could properly be made and this can be effected by the setting up of a platform price in Amelia for an amount less than the present Norfolk-Portsmouth base price to cover the necessary handling and transportation cost from Amelia to Norfolk."

In their contention that the Commission has fixed a different price for the same grade of milk delivered at Amelia station and delivered at Norfolk, the producers rely upon *Lucerne, etc., Co.* v. *Milk Commission*, 182 Va. 490, 29 S. E. 2d 397, and *Safeway Stores* v. *Milk Commission*, 197 Va. 69, 87 S. E. 2d 769. These cases, however, are not in point here. They did not involve the consideration of prices paid by distributors to producers. They considered only prices to be charged for milk sold by distributors to their customers.

Code, § 3-359 provides that "The Commission, after public hearing and investigation, may fix the prices to be paid producers or associations of producers by distributors in any market or markets," and then provides for the fixing of "minimum and maximum wholesale and retail prices to be charged for milk in any market," etc. There is no provision for fixing of maximum and minimum prices to be paid producers. In fixing prices to be paid distributors by the customers there are certain facts and circumstances that are wholly irrelevant and unnecessary in the fixing of prices to be paid to producers. Factors and circumstances in connection with wholesale and retail prices are not present or involved in the latter instance.

Some of the producers whose bases are assigned to Birtcherd are

located in Norfolk County and Princess Anne County, immediately adjacent to the Norfolk-Portsmouth sales area; while the Amelia producers are distant 125 to 150 miles from Norfolk. It would be difficult, if not impossible, to arrive at an average cost applicable to producers who do not operate under similar conditions. Situations throughout the different areas vary according to soil, vegetation, costs of labor and distance from market. Had the legislature intended to provide for the fixing of minimum and maximum prices to be paid producers, it would have specifically provided therefor. The prices fixed to be paid the producers in this case do not constitute a real differential in the price of milk. The difference is in the net amount received by the several producers arising out of the variance in transportation costs. The producers who have been directed to make delivery at Norfolk will escape the hauling charge of 35¢ per cwt. from their farms to Amelia; but they will be required to expend approximately 50¢ per cwt. to transport their milk from their farms to Norfolk, in addition to the expense required because of the cost of the more modern equipment, in order to make such direct shipment, plus the expense of the maintenance of same.

The evidence further showed that during the first eight months of 1954, after paying the handling and transportation charges complained of, the Amelia Producers received 41¢ per cwt. more for their milk than producers supplying the Richmond market, and 42¢ per cwt. more than received by producers supplying the Washington market.

In view of the very broad powers conferred upon the Commission to make, adopt, and enforce all rules, regulations, or orders necessary to carry out the provisions of the Act, § 3-352 (g), we do not think that the designation of places for delivery of milk to the distributor, and the regulation of hauling allowances to distributors for transporting such milk to their processing plants are beyond the authority of the Commission.

We find nothing in the evidence to justify the contention that the Commission has been unreasonable, arbitrary or discriminatory in designating certain producers to make delivery at Norfolk and others at Amelia, nor do we find that the effect of setting different prices based on the cost of hauling is in violation of the Act under consideration. We cannot say that the Commission, in an overall view of all the facts and circumstances involved, including a consideration of the interests of the industry and the public, exceeded its authority or abused its discretion in entering the orders complained of.

■ What we have said answers the contention of Birtcherd that the Commission erred in refusing to order all of the production of the Amelia producers to be delivered to it at its Amelia receiving station, and in denying it the right to elect to which of its plants such production should be delivered. In its brief, it concedes the constitutionality of the Act; but vigorously attacks the wisdom of its enactment and the method of its enforcement. It specifically challenges the rules, regulations and orders of the Commission hereinbefore considered. It says that the Commission, in compelling the producers to sell and the distributors to buy, exercises a drastic and confiscatory power which exceeds the limits of the police power. The attack upon the regulations is similar to that which has been made in numerous instances against the Act itself. Notwithstanding those attacks, and despite frequent appeals to the General Assembly of Virginia, the administrative policy of the Commission has been established and adhered to over a period of years, and there has been no amendment or alteration of the statute.

Birtcherd further argues that there is an irreconcilable conflict between Regulations 5, G and 5, J of the Norfolk-Portsmouth Market, which respectively require the producer to sell his milk to a specified distributor and require that distributor to receive such milk, on the one hand, and Regulation No. 1, which provides minimum prices to be paid to such producers on the other hand. The conflict is said to exist because any price may be charged under Regulation No. 1, which is not lower than the minimum prescribed, and, therefore, milk prices may be the subject of bargaining between the producer and the distributor. It contends that this is an exercise of a confiscatory power. It should be noted that these cases do not involve a demand by the producer for a price in excess of a minimum price.

We construe the regulation fixing the minimum price as a definite and specific price for milk supplied by the producer to the distributor, and it has been so construed and accepted by the Commission and the industry. The right of the parties to bargain between themselves for a price is denied by the powers granted to the Commission in the exercise of the police power of the State.

For the purpose of carrying out the provisions of the Act, the Commission, under Code, § 3-360, requires all distributors in any market designated by the Commission, to be licensed by it. When a distributor applies for a license, he agrees to conform to the provisions of the Act and the rules and regulations of the Commission.

Granted a license he is at liberty to surrender it; but if he desires to operate as a distributor, he must conform to the provisions of the Act and the rules, regulations and orders of the Commission promulgated thereunder.

To sustain the contentions of the appellants would strike at the very heart and purpose of the legislation. The Commission could no longer exercise the powers and duties conferred upon it.

We find no merit in any assignment of error in the two appeals, and for the reasons stated, the orders appealed from are affirmed.

*Affirmed.*