121 So.2d 625 (1959)
BORDEN COMPANY, a Corporation, et al., Appellants,
v.
J. Brailey ODHAM, Chairman, et al., Appellees.
Supreme Court of Florida.
July 31, 1959.
On Rehearing June 22, 1960.
Rehearing Denied July 13, 1960.
*626 Bedell & Bedell, Harold Colee, Jr., Loftin & Wahl, Jacksonville, and Mabry, Reaves, Carlton, Fields & Ward, Tampa, for appellants.
Winston E. Arnow and Harry C. Duncan of Clayton, Arnow, Duncan & Johnston, Gainesville, for appellees.
Scruby & Yonge, Orange Park, for intervenors-appellees.
PER CURIAM.

Statement of Facts
Under Florida law fluid milk is sold and distributed under three classifications. Class I is milk sold in fluid form for human consumption; Class II is milk from which the cream is separated and the skim milk used for purposes other than sale in fluid form for human consumption; Class III is milk from which the cream is separated and the skim milk "dumped."
Prior to October, 1957, the Milk Commission, hereinafter referred to as the "Commission," fixed the minimum prices payable by distributors to producers for Class I milk but did not fix minimum prices for milk sold as Class II and Class III.
Prior to October, 1957, the Commission entered orders establishing a base-fixing period for each of the several milk marketing areas subject to its jurisdiction under which each producer would earn a "base" or "base percentage," determined by the ratio of the amount of milk delivered by him to his distributor to the total amount of milk delivered to the distributor by all producers during the base-fixing period. The Commission's base-fixing order provided that the base percentage assigned to each producer should be applied to the total number of gallons of milk sold by *627 the distributor in Class I channels for the purpose of determining the number of gallons of milk for which each producer would be paid the Commission-fixed price for Class I milk. As previously stated, the Commission fixed no prices for Class II and Class III milk and no base-fixing order of the Commission purported to apply to or govern the production or sales of Class II or Class III milk.
Prior to October, 1957, the distributors customarily accepted all of the milk produced and delivered to them by their producers, utilizing as much as possible in Class I channels and accounting to the producers for milk sold in Class I channels according to the producers' earned base percentages and paying the producers for the milk received in excess of Class I sales, prices determined by the distributors to be the value of the butterfats and serum solids recovered from such excess milk and utilized or sold for Class II and Class III purposes.
On October 15, 16 and 17, 1957, the Commission held a meeting at Tallahassee, Florida, at which it considered adoption of a statewide base-fixing order and of a statewide price-fixing order which would prescribe minimum producer prices for Class I milk, Class II milk and Class III milk, the latter two of which were not theretofore regulated by the Commission.
On October 17, 1957, the Commission voted to establish minimum producer prices, effective December 1, 1957, in all areas controlled by the Commission of 43¢ per gallon for Class II milk, and 30¢ per gallon for Class III milk. The price of 61¢ per gallon previously established for Class I milk was republished in the new order.
Considering that the minimum prices payable to producers for Class II and Class III milk under the orders so made exceeded the cost of purchasing butterfats and serum solids from other sources to such an extent as to make it economically unsound for the distributors to accept and pay the Commission's prices for such excess milk, the plaintiffs notified their producers that when the Commission-fixed prices for Class II and Class III milk should become effective on December 1, 1957, the plaintiffs would limit the amount of milk accepted from their producers to their anticipated needs for Class I purposes.
On November 19 and 20, 1957, before the price orders voted by the Commission at its October meeting were actually entered, the Commission held another meeting at Tallahassee and voted to revise the prices of Class II and Class III milk which had been adopted at its October meeting. In lieu thereof the Commission voted to adopt price orders, effective January 1, 1958, prescribing the revised minimum prices to be paid producers for Class I, Class II and Class III milk. No change was thereby made for Class I milk, but in lieu of a straight 43¢ for all Class II milk, the revised orders provided for a price of 43¢ for so much of Class II milk as equaled 5% of the Class I milk, and for the balance of Class II milk, the price was to be determined in accordance with the "Miami formula." The price of Class III milk was reduced from 30¢ per gallon to 26¢ per gallon. After this action was taken by the Commission, the plaintiffs informed their producers that their policy of not accepting milk in excess of Class I requirements would not become effective until January 1, 1958, the effective date of the Commission's revised orders.
Unwilling to accept the Commission-fixed prices for excess milk delivered by their producers, the plaintiff-distributors on December 13, 1957, filed a complaint in Circuit Court of Leon County alleging, among other things, that the Commission was contending that it had power to compel the plaintiffs to accept all of the milk tendered to them by their producers and to pay the Commission-fixed prices therefor, regardless of the distributors' needs or the distributors' willingness to continue accepting such milk; that Commission representatives *628 were making threats to revoke the licenses of the plaintiffs should they refuse to accept all of the milk tendered to them by their producers. The complaint further alleged that no one of the plaintiffs desired to continue purchasing milk from his producers in excess of such plaintiffs' Class I requirements at prices fixed by the defendant Commission or at prices arrived at in any way other than through mutual agreements with plaintiffs' producers, free from compulsion of any order of the Commission purporting to fix minimum prices for such excess milk.
The complaint further says that the Commission does not have the power and authority to compel plaintiffs to accept all milk produced and delivered by their producers and to pay the minimum prices fixed by the Commission for milk used for Class II and Class III purposes regardless of plaintiffs' willingness to purchase all of such milk. Plaintiffs also contend that should the milk law be construed as granting such power and authority to the Commission, the provisions of that law would deprive them of their liberty of contract and their property without due process of law in violation of Section 12 of the Declaration of Rights, Constitution of Florida, F.S.A., and the Fourteenth Amendment, Constitution of the United States. The complaint prayed for injunction and for declaratory decree to determine whether the Commission has the power and authority to require distributors and producer-distributors subject to its jurisdiction to accept any part or all of the milk produced and delivered to them by their producers, including milk which the distributors or producer-distributors neither need nor want. The plaintiffs further prayed that should the court determine that the Commission has such power and authority, the court should further determine and decree:
(a) Whether such authority is limited to requiring acceptance and payment for milk utilized in Class I channels only, or whether such power and authority exists in respect to all classes of milk;
(b) Whether such power and authority is affected by the amount of milk delivered and accepted during the base-setting period and, if so, the extent which such power and authority is so affected, and
(c) Whether such power and authority includes power and authority to prohibit and prevent the distributors and producer-distributors from limiting the amounts of deliveries by producers during the base-setting period.
To this complaint the Commission filed an answer and counterclaim. In their answer they assert that the suit was premature because they say that they have not yet determined whether they have, or believe they have, the power and authority to require the plaintiffs and other distributors or producer-distributors subject to the Commission's jurisdiction to accept all milk produced and delivered to them by their producers and to pay the minimum price fixed by the Commission for the milk used for Class II and Class III purposes regardless of the distributors and producer-distributors' Class I requirements and regardless of their willingness to purchase all such milk.
In their counterclaim defendants prayed that the court enjoin plaintiff-distributors [appellants here] from rejecting milk delivered or tendered to them by their producers pursuant to the notices which had been given by the plaintiffs to their producers or for the reasons set forth in the complaint. On December 23, 1957, temporary injunction was entered restraining defendants from instituting any proceedings against the plaintiffs because of any refusal to accept or pay the prices for milk delivered by or on behalf of their producers in excess of those quantities or prices which would be applicable in ordinary continuance of a previous course of dealing and further restraining the plaintiff-distributors from rejecting any milk delivered or tendered for delivery by or on behalf of any producer in ordinary continuance of a previous course of dealing. The plaintiff-distributors *629 were required to file bonds in substantial amounts conditioned, among other things, that each of the plaintiffs pay to all of its producers such sum or sums owing said producers in the event it should be finally held that such plaintiff was obligated to accept the milk which it did accept and to pay for same in excess of the amount it did pay.
In reply to defendants' counterclaim, plaintiffs alleged that the Commission was without power and authority asserted by it, that none of the plaintiffs was obligated by contract or by any previous course of dealing with its producers to accept milk in excess of Class I requirements at Commission-fixed prices. They further alleged that they had given their respective producers reasonable advance notice of their plans to limit deliveries to Class I requirements as they were lawfully entitled to do; that under the previous course of dealing between the plaintiffs and producers the prices for Class II and Class III milk were determined not by order of the Commission but by the distributors taking into consideration the value of the ingredients of the milk to them, and that the intervention of the Commission's price orders for Class II and Class III milk was reasonable cause for discontinuing such previous course of dealing. The reply repeated the claims of constitutional invalidity asserted in the complaint and further alleged that the real purpose and intent of the Commission was to force plaintiffs to buy Florida milk for their manufacturing purposes and prevent plaintiffs from importing and using milk or its ingredients from outside the State of Florida in lieu of Florida milk for such purposes and to set up an economic barrier to protect Florida milk supply from competition without the state, irrespective of economic considerations, in violation of the Commerce Clause of the Federal Constitution.
On January 16, 1958, the Commission adopted its official Order No. 20-11, effective February 15, 1958, providing for annual base-fixing periods in each of the milk marketing areas, other than the Pensacola area, and providing that the base percentage earned by each producer should be applicable to all classes of milk whereas the former base-fixing orders had related to Class I milk only. Official Order No. 20-11 provided also that unless terminated in accordance with Official Order No. 20-7, all existing bases and relationships between producers and distributors or producer-distributors should remain in full force and effect until the first day of the second month following the end of the first base-fixing period and that said base or bases should be construed as a binding contract between producers and their distributors or producer-distributors.
Construing Order No. 20-11, the Chancellor held that the Commission did have power to require distributors and producer-distributors to accept and pay for milk in accordance with the price-fixing and base-fixing orders, provided, of course, that the Commission acts reasonably in doing so under the particular circumstances that may be involved.
By petition for certiorari originally filed in this court but transferred to the Circuit Court of Leon County, National Dairy Products Corporation directly attacked the validity of the Commission's new price orders which, for the first time, fixed minimum prices for Class II and Class III milk. After the Commission's new base-fixing Order No. 20-11 became effective, Foremost Dairies, National Dairy Products, doing business as Sealtest Southern Dairies Division, and The Borden Company, doing business as Borden Dairy Division, filed certiorari proceedings in the Circuit Court of Leon County directly attacking the validity of Order No. 20-11.
In the instant suit, the Commission filed a motion for final decree on the issues made by the complaint and the defendants' answer and a further motion for summary decree upon the issues made by the defendants' counterclaim and the reply thereto, *630 defendants' motions being supported and opposed by affidavits.
All three of the related proceedings mentioned [the certiorari proceeding attacking the price-fixing orders, the certiorari proceeding attacking the base-fixing order and the defendants' two motions for summary decrees in the instant case] came on for hearing on the same day before Circuit Judge Willis. Following that hearing, Judge Willis entered his order in the certiorari proceedings fully sustaining the validity of the Commission's price-fixing orders and the Commission's base-fixing order. Still later, and after a further hearing in the instant case, he entered summary final decree fully sustaining all the asserted powers of the Commission and overruling all of the contentions made by the appellants in opposition to the existence and constitutional validity of the asserted powers.
To review the Chancellor's order sustaining the validity of the Commission's price-fixing orders, the contestant of those orders filed an appeal to this court and a petition for certiorari, which appeal and petition for certiorari are still pending, styled National Dairy Products Corporation v. Odham, Fla., 121 So.2d 640.
To review the order of Judge Willis sustaining the validity of the Commission's base-fixing order, contestants of that order filed an appeal to this court and a petition for certiorari. That case is pending in this court under the style Foremost Dairies v. Odham, Fla., 121 So.2d 636.
The plaintiffs in the instant case appealed to this court to review the summary final decree entered by the Chancellor and assigned error upon all of the adverse rulings therein. Since the foregoing statement of the cause has to do with all three cases and the question of jurisdiction is raised in all of them, we dispose of that question first. When the cases were heard on the question of jurisdiction, all Justices agreed that we had jurisdiction in this case. As to National Dairy Products Corporation v. Odham and as to Foremost Dairies v. Odham, the Justices were not in agreement on the question of jurisdiction but a majority agreed that on account of kindred questions in the three cases, similar complexes involved in all, common parties in all and for other good and sufficient reasons, the court should take jurisdiction of and dispose of them. It is unfortunate that on account of difference in questions all three cases could not be disposed of with one opinion but the statement in this case will suffice for all three cases and the questions will be disposed of with as little repetition as possible. We discuss the question of jurisdiction first.

Jurisdiction
Much space in the briefs is devoted to the question of whether or not under Article V of the Constitution of Florida and the applicable rules this court has jurisdiction to review the summary final decree appealed from. Limited to this case the question of jurisdiction is concluded by that part of Section 4(2), Article V of the Constitution as follows:
"Appeals from trial courts may be taken directly to the supreme court, as matter of right * * * from final judgments or decrees directly passing upon the validity of a state statute * * *".
The general rule is that mere construction of a statute, whether right or wrong, does not present a constitutional question vesting the appellate court with jurisdiction to review the judgment. A challenge to a statute that invests the appellate court with jurisdiction on the ground that a constitutional question is raised must be grounded on the fact that the statute is inherently invalid or unconstitutional. Hayes v. Hayes, Mo. 1944, 153 S.W.2d 1; State v. Hatton, 1950, 240 Mo. App. 1244, 228 S.W.2d 10; Phillips Pipe Line v. Brandstetter, 1953, 363 Mo. 904, 254 S.W.2d 636; Mesenbrink v. Boudreau, Mo. App. 1943, 171 S.W.2d 728; McManus v. Burrows, 1919, 280 Mo. 327, 217 S.W. 512.
*631 As to federal jurisdiction when due process and equal protection and nothing more than the interpretation of a state statute is involved, the following cases are pertinent: Starin v. New York, 1885, 115 U.S. 248, 6 S.Ct. 28, 29 L.Ed. 388; Central Land Co. v. Laidley, 1895, 159 U.S. 103, 16 S.Ct. 80, 40 L.Ed. 91; Knop v. Monongahela River Consolidated Coal & Coke Co., 1908, 211 U.S. 485, 29 S.Ct. 188, 53 L.Ed. 294. Constitutional questions that are merely colorable and unrelated to the particular facts presented pose no substantial basis upon which direct appeal as matter of right will lie to this court. Evans v. Carroll, Fla. 1958, 104 So.2d 375; State v. DeMeo, 1955, 20 N.J. 1, 118 A.2d 1, 56 A.L.R.2d 905. These observations as to the general rule may be pertinent in view of the fact that the other two cases hereafter discussed have the point involved in them.
On the question of constitutional validity, appellants direct their assault primarily to the ground that the construction imposed by the Chancellor on Chapter 501, Florida Statutes, F.S.A., is unconstitutional in that it deprives them of due process guaranteed by Section 12, Declaration of Rights, Constitution of Florida, the Fourteenth Amendment to the Constitution of the United States and that it offends the Commerce Clause of the Federal Constitution, art. 1, § 8, cl. 3.
We do not think the construction of the law as applied to appellants is unconstitutional. In fact we do not see that the Commerce Clause of the Federal Constitution has any proper place in the argument. We have been shown no reason why Chapter 501, Florida Statutes, F.S.A., is not well within the police power of the legislature to promulgate. The powers vested in the Commission contemplates the protection of the public, the producer and the distributor of milk. The powers of the Commission must be reasonably exercised and there is no showing here that they have been imposed in an unreasonable or harsh manner. As to that aspect of appellants' grievance directed to the price-fixing and other orders of the Commission, the provision for notice, hearing and an opportunity to be heard remove this objection and there is no showing that appellants suffered from these or failure to invoke them. It is accordingly our view that the Chancellor correctly held that infringement of liberty of contract as constitutionally understood, the violation of due process or the Commerce Clause, or any of them, are not shown here.
The question of jurisdiction disposed of, appellants rely on the following point to support their contention:
"Whether under the provisions of the Florida Milk Law, Chapter 501, Florida Statutes [F.S.A.], the Florida Milk Commission has the power and authority to require distributors and producer-distributors subject to its jurisdiction to accept any part or all of the milk produced and delivered to them by their producers, including milk which the distributors and producer-distributors neither need nor want, and to require the distributors and producer-distributors to pay for any part of such milk at minimum prices fixed by the Florida Milk Commission."
Appellants charge that in answering this question the Chancellor was over restrictive in his consideration of the different provisions of Chapter 501, Florida Statutes, F.S.A. An examination of the final decree in toto does not support this contention. In addition to what has been said, we could rest the answer to this question on what was said in Miami Home Milk Producers' Ass'n v. Milk Control Board, 124 Fla. 797, 169 So. 541 and Shiver v. Lee, Fla., 89 So.2d 318. These cases deal with the broad powers vested in the Commission under the police power. Chapter 501, Florida Statutes, F.S.A., has to do with this very point and there is no showing that the action of the Commission was unreasonable or arbitrary. After all is said, this seems to be the test of validity. See also Southside Cooperative Milk Producers' Ass'n v. State *632 Milk Commission, 1956, 198 Va. 108, 92 S.E.2d 351. We could write no better answer to the question under review than what was said in the last cited case and what we said in Shiver v. Lee, supra.
On the point of whether or not Chapter 501, Florida Statutes, F.S.A., gives the Commission power to require distributors to take all or any part of the producers' milk, it is necessary that we thoroughly examine some phases of the act. As declared by the legislature, the purpose of the act had to do with the supervision and regulation of the production and distribution of milk. The evils that prompted such exercise of the police power were the "unhealthful, unfair, unjust, destructive, demoralizing and uneconomic trade practice," which had grown up and "been carried on in the production, sale and distribution of milk, cream and milk products," imperiling the constant supply of pure and wholesome milk. Section 501.01, Florida Statutes, F.S.A.
To remedy this state of affairs the Commission was clothed with power to (1) supervise and regulate the entire milk industry, including production, transportation, manufacture, storage, distribution, delivery and sale; (2) see that producers get a fair return for their product; (3) establish prices; (4) make, adopt and enforce all rules, regulations and orders necessary to carry out the purpose of the act and to establish reasonable rules and regulations for fair competition, and to regulate all matters reasonably incidental to general or specific powers. Section 501.04, Florida Statutes, F.S.A.
In addition to these general powers, the Commission was clothed with certain specific powers which authorized it to revoke, suspend or refuse to issue a license when satisfied that (1) a milk dealer has rejected, without reasonable cause, any milk purchased from a producer or has rejected, without reasonable cause or reasonable advance notice, milk delivered by or in behalf of a producer in ordinary continuance of a previous course of dealing, except where contract has been lawfully terminated; (2) that the milk dealer has committed any act injurious to the public welfare, public health or trade or commerce in demoralization of the price structure of pure milk to such an extent as to interfere with an ample supply thereof. Section 501.09(3), Florida Statutes, F.S.A. In other words, the dominant purpose of the act was to protect the public, the producer and the distributor.
These powers to supervise and regulate the milk business in Florida are common to those regulating the milk business in other states and have been upheld as proper exercise of power if not done in an arbitrary and unreasonable manner. The transportation business and other businesses are similarly regulated. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 and Shiver v. Lee, supra.
It is, therefore, our opinion that on account of the liberal powers vested in the Commission by Chapter 501, Florida Statutes, F.S.A., the finding that it was a proper exercise of the police power and the manifest purpose of the act, the conclusion of the Chancellor that the Commission had authority to require distributors and producer-distributors to accept all milk from their producers and pay minimum prices therefor, provided it acts reasonably under the circumstances before it, is amply supported and should be affirmed.
Appellants next raise the question of whether or not the power of the Commission (a) is limited to requiring acceptance of and payment for milk utilized in Class I channels only, or whether such power and authority exists with respect to all classes of milk; (b) is affected by the amount of milk delivered to and accepted by the distributor during the base-fixing period; (c) includes power and authority to prohibit and prevent distributors from limiting the amounts of deliveries by their producers during the base-fixing periods.
The Chancellor gave the following answer to these questions:

*633 "This power applies to all classes of milk and not only milk utilized in Class I channels only. Such power and authority is not affected by the amount of milk delivered and accepted during a base setting period except to the extent that, as in all of the circumstances, such power must be reasonably exercised. There is also power and authority to prohibit and prevent distributors and producer-distributors from limiting the amounts of the producers during the base setting periods, provided, again, such power is reasonably exercised."
Clearly the Commission has the power to require the distributor to take milk delivered pursuant to a previous course of dealing between the parties. It [Commission] may also authorize the adoption of what in the trade is known as utilization pricing, by virtue of which the producer is paid the highest price for Class I milk and correspondingly lower prices for Class II and Class III milk. The greatest advantages of such a system clearly flow to the distributor for he pays for milk based upon his own utilization thereof. And, pursuant to such a system, so long as the Commission acts within reason, it may encourage or require the distributor to take all the producer's milk. Appellants consented to abide by such valid acts and orders of the Commission when they applied for and received their licenses to operate.
After all is said, we come back to the proposition that the regulations imposed on the distributors and the producers were imposed with the view of fairness to both and to guarantee the public a constant supply of wholesome milk. No other way has yet been devised to carry out the purpose of the act. Many states have enacted such legislation and so long as the Commission enforces them with reason they have been upheld.
Point three raised by appellants is as follows:
"Whether the provisions of Chapter 501, Florida Statutes [F.S.A.], construed as granting such power and authority to the Florida Milk Commission, and the Commission's orders thereunder, are violative of the State and Federal Constitutions:
"(a) Because they deprive the distributors of their liberty of contract and property without due process of law in violation of Section 12 of the Declaration of Rights of the Florida Constitution and the Fourteenth Amendment to the Constitution of the United States;
"(b) Because they offend against the Commerce Clause of the Federal Constitution."
This question is based on the interpretation given by the Chancellor to Chapter 501, Florida Statutes, F.S.A. It is contended that the intepretation imposed deprived appellants of their liberty of contract and property without due process in violation of Section 12, Declaration of Rights, and the Fourteenth Amendment to the Federal Constitution.
Miami Home Milk Producers' Ass'n v. Milk Control Board, 1936, 124 Fla. 797, 169 So. 541, and Shiver v. Lee, Fla. 1956, 89 So.2d 318, are relied on to support this contention. We have examined these and other cases but find no merit to the contention. The statute gave the appellees power to impose minimum prices on all classes of milk and there is no showing of arbitrary action on the part of the legislature or the appellees. Under the police power, there can be no question of the power of the Commission to make the orders in question so long as arbitrary and unreasonable action is not shown. In addition to authorities already cited on the question, see College Arms Hotel Co. v. Atlantic Coast Line R. Co., 1911, 61 Fla. 550, 54 So. 459; State ex rel. R.R. Com'rs v. Atlantic Coast Line R. Co., 1914, 67 Fla. 441, 63 So. 729; State ex rel. Lamar v. Jax Terminal Co., 1899, 41 Fla. 377, 27 So. 225, and others.
*634 We have examined H.P. Hood & Sons v. DuMond, 1948, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865; Baldwin v. G.A.F. Seelig, 1934, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, 101 A.L.R. 55; Foster Fountain Packing Co. v. Haydel, 1928, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147; Appeals of Port Murray Dairy Co., 1950, 6 N.J. Super. 285, 71 A.2d 208; Gustafson v. City of Ocala, Fla. 1951, 53 So.2d 658; Dean Milk Co. v. Madison, 1950, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329, but find nothing to support a contrary view.
We find no showing that appellants are affected by interstate commerce but if they are, mere loss of economic advantage or income would not affect the situation. In our view the following cases conclude the constitutional questions: Southside Cooperative Milk Producers' Ass'n v. State Milk Commission, 1956, 198 Va. 108, 92 S.E.2d 351; Bailey Farm Dairy Co. v. Anderson, 8 Cir., 1946, 157 F.2d 87, certiorari denied 1946, 329 U.S. 788, 67 S.Ct. 355, 91 L.Ed. 675; Nebbia v. New York, 1933, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Wallace v. Ganley, 1938, 68 App. D.C. 235, 95 F.2d 364; Benson v. Schofield, 1956, 98 U.S.App.D.C. 424, 236 F.2d 719.
The concluding question raised by appellees' cross-assignments of error charges that the chancellor erred in dissolving the temporary injunction against appellants rather than making it permanent.
The Chancellor refused to make the temporary injunction permanent because it did not clearly appear "that the plaintiffs are threatening or intending to violate any provision of the law or any valid orders of the Milk Commission."
A better reason for refusing a permanent injunction could hardly have been given. We would not reverse the Chancellor on such a holding. It is true that a permanent injunction would deter appellants from violating the law as held by the Chancellor but we will not assume that under the circumstances shown here they will do so. The Chancellor's decree on this point as in all others was free from error.
The decree appealed from is therefore affirmed in all respects.
Affirmed.
TERRELL, HOBSON, ROBERTS and THORNAL, JJ., concur.
THOMAS, C.J., dissents.

On Rehearing
PER CURIAM.
The original majority opinion affirmed the decree of the Chancellor in its entirety. Rehearing has been granted and the cause has been reargued. It is now the view of the majority that in some respects our original opinion must be revised.
By their petition for certiorari in the Circuit Court the petitioners leveled an assault against order No. 20-11 of Florida Milk Commission. By Order No. 20-11 the Commission established a plan of relationship between producers and distributors aimed at providing "an orderly production of milk and an orderly distribution of milk and milk products in all of the milk marketing areas in Florida under its supervision or regulation, except the Pensacola Milk Marketing Area."
By the plan an annual base fixing period was established for each milk marketing area. During this period a base percentage was established for each producer by calculating the ratio of milk delivered by him to his distributor to the total milk delivered by all producers to such distributor for the entire base fixing period. This constitutes the producers "earned base." The order then provides that the base percentage earned by each producer shall be applied to the total number of gallons of milk utilized in each class by the distributor in order to determine the number of gallons of milk for which the producer must be paid at the price fixed by the Commission.
*635 Order 20-11 then provides that the base or bases "shall be construed as a binding contract between producers and their distributors or producer-distributors" and that this contract remain in force unless terminated in accord with Commission Order No. 20-7.
In effect Order 20-7, supra, provides that once a producer has established "a base" with a distributor the relationship cannot be terminated by either party except upon a showing of "just cause" in addition to 90 days' notice before any new base fixing period. In other words, by these two rules the Commission wrote a contract between producers and distributors, provided for its indefinite continuance, and authorized its termination only after 90 days' notice plus a showing of what the Commission deems to be "just cause."
Section 501.05, Florida Statutes, F.S.A., reads in part as follows:
"The commission shall adopt and enforce all rules and orders necessary to carry out the provisions of this chapter, and may formulate procedures and regulations whereby the commission may through the services of the administrator and its various area deputies render all possible assistance to milk distributors and dairy farmers in ascertaining current milk supply needs in all areas of the state and in securing the cooperation of distributors and dairy farmers in the transfer of milk not needed for class 1 purposes from one distributor to another and from one area to another, in order that the consumer may be assured of a more adequate supply of fresh wholesome milk at all times and the dairy farmer may receive the best marked classification possible for the milk which he produces; and shall set a standard date as the date from which not less than ninety days notice in writing must be given by the dairy farmer or distributor before the theretofore established relationship between the dairy farmer and distributor may be terminated * * *" (Emphasis supplied.)
The words italicized were among amendments added by Chapter 28137, Laws of Florida, 1953.
Section 501.09(3), Florida Statutes, F.S.A., authorizes the Commission to decline to grant any license or permit, or to suspend or revoke any license or permit already granted, after notice and hearing when satisfied that certain conditions exist. Among these are:
"That a milk dealer has rejected, without reasonable cause any milk purchased from a producer or has rejected without reasonable cause or reasonable advance notice, milk delivered by or on behalf of a producer in ordinary continuance of a previous course of dealing except where contract has been lawfully terminated."
Without referring to Section 501.05, supra, the Chancellor construed Section 501.09(3) (a), supra, as authorizing a requirement of a showing of both cause and notice as conditions to terminating the continuing contract which the rule itself constructed.
In our original opinion we indulged the assumption that the Commission would always act reasonably in passing on what might constitute "just cause" and therefore we could find no harm in the imposition of a requirement in addition to notice.
In so ruling, we have now concluded that both we and the Chancellor read into the authorizing statute rule-making power which is not there.
Analyzing the quoted provision of Section 501.09(3) (a), supra, it is clear that a license can be revoked:
(1) if a dealer has rejected "without reasonable cause" any milk purchased;
(2) has rejected "without reasonable cause" or "reasonable advance notice" milk delivered in ordinary continuance of a previous course of dealing except *636 where contract has been lawfully terminated.
It appears to us that under this statute if milk has already been purchased it can be rejected only for reasonable cause. On the other hand, if milk is merely delivered pursuant to previous course of dealing it can be rejected either for (1) reasonable cause, or (2) reasonable advance notice regardless of cause.
When the Legislature enacted Chapter 28137, Laws of 1953, it specifically added to Section 501.05, supra, a mandatory requirement that the commission set a standard date from which 90 days' notice must be given by either party in order to terminate the established relationship.
A careful analysis of these statutes leads us to the conclusion that the Legislature obviously contemplated an established date each year prior to which a producer or distributor could merely serve noce, without more, and thereby terminate the continuance of the course of dealing. With equal clarity the Legislature fixed 90 days as a reasonable period for such notice. This leads us to the conclusion that when the Milk Commission inserted in Order No. 20-7 a requirement for a showing of cause in addition to 90 days' notice in order to terminate a previously established course of dealing it exceeded its authority under the enabling statute.
Our opinion of July 31, 1959, is therefore modified to the foregoing extent. In other respects it is adhered to on rehearing.
The final decree will therefore have to be reversed and the cause is remanded for the entry of a decree consistent with the foregoing.
It is so ordered.
HOBSON, ROBERTS, DREW, THORNAL and O'CONNELL, JJ., concur.
THOMAS, C.J., adheres to original dissent.
TERRELL, J., adheres to original opinion.